[L. A. No. 6291.  In Bank.—February 17, 1922.]

## GERHARDT C. F. MICHEL, Respondent, v. C. G. SMITH et al., Appellants.

[1] PUBLIC OFFICERS—ACTS OF SUBORDINATES—LIABILITY FOR.—A public officer is not responsible for the acts or omissions of subordinates properly employed by or under him, if such subordinates are not in his private service, but are themselves servants of the government, unless he has directed such acts to be done or has personally co-operated therein.

[2] ID.—CHIEF OF POLICE—NONLIABILITY FOR ACTS OF SUBORDINATES.— While a sheriff is responsible for the acts of his deputies, as they are acting in his private service and in his name and stead and are only public officers through him, a chief of a municipal police department, even though he be charged with the duty of selecting the members of the force, is not responsible for their acts, unless he has directed such acts to be done, or has personally co-operated in the offense, for each policeman is, like himself, a public servant.

[3] ID.—LOS ANGELES CHARTER—CHIEF OF POLICE—NONLIABILITY FOR SUBORDINATES.—The chief of police of Los Angeles, in his capacity as fixed by the charter, may not be held liable in damages for the unlawful acts and omissions of the subordinates of the department, selected pursuant to the provisions of the charter, unless it can be shown that he has directed such acts or personally co-operated therein.

[4] ID. — SERGEANT OF POLICE — NONLIABILITY FOR ACTS OF SUBORDINATES.—A sergeant of police of the city of Los Angeles in charge of a detail of members of the police force, known as the "war squad," organized to apprehend deserters and offenders against the United States selective service law, is not liable for the acts of members of the squad in making an arrest where he gave no general or specific directions in the matter and had no knowledge of the arrest until he read a report of the occurrence made by the arresting officers.

[5] ID.—ACTION FOR FALSE ARREST—PROBABLE CAUSE—SUFFICIENCY OF EVIDENCE.—Where a young man twenty-four years of age, and unmarried, registered with the local board under the provisions of the Selective Service Act, during the World War, and was entered as a class A–1 man, which meant that he was subject to immediate call for service in the United States army at any moment, left the place of his local board and went to a city nearly five hundred miles away, but failed to obtain from his local draft

1. Liability of public officers for acts of subordinates, note, 12 Ann. Cas. 185; 1 A. L. R. 222; 12 A. L. R. 980.

board any evidence that he had notified it of his change of address, police officers charged with the duty of apprehending deserters had reasonable grounds for arresting and detaining him as a deserter, and are not liable in damages therefor in an action for false arrest.

[6] Id. — What Constitutes Probable Cause. — Whether there is probable cause for making an arrest depends upon all the circumstances of each case, including delay which might enable the guilty person to escape, the nature of the information, the character of the person at whose instance the alleged wrongful arrest is made, and the extent of possible inquiry as to facts and circumstances.

[7] Id. — Definition of Probable Cause. — Probable cause may be defined as a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.

[8] Id. — Question of Law. — In an action for damages for false arrest, the court must determine, as a matter of law, whether the facts and circumstances as they appear, or are found to exist, constitute probable cause.

APPEAL from a judgment of the Superior Court of Los Angeles County. L. H. Valentine, Judge. Reversed.

The facts are stated in the opinion of the court.

Charles S. Burnell, City Attorney, Jess E. Stephens, City Attorney, Wm. P. Mealey, Assistant City Attorney, and Lucius P. Green, Deputy City Attorney, for Appellants.

W. A. Strong and Andrew H. Rose for Respondent.

WASTE, J. — The plaintiff brought this action to recover damages for alleged unlawful arrest and imprisonment by certain police officers of the city of Los Angeles. The defendants Butler, as chief of police, and Slaughter, as sergeant of police, were at no time connected with the arrest complained of, but are sued by reason of their being the superior officers of defendants Smith and Gross, who made the arrest. The case was tried by the court sitting without a jury. At the conclusion of the plaintiff's case the defendants Butler and Slaughter made a motion for a nonsuit as to them, which motion was denied. On findings favorable to the plaintiff, judgment was entered in his favor and against all the defendants, from which this appeal is taken.

No error of law, or in the admission of evidence, occurring during the trial, is assigned, the question to be determined on the appeal being whether or not any of the defendants can be held liable on the plain facts, which appear without substantial contradiction. The discussion of the subject naturally divides itself into three heads: *First,* the relation of the chief of police; *second,* the liability of the sergeant of police, and, *third,* the responsibility of the arresting officers.

The arrest and detention of the plaintiff occurred during the recent war in which the government of the United States was involved. It was made by the defendants Smith and Gross, who were members of the "war squad" of the Los Angeles police department, organized expressly for the purpose of apprehending deserters and offenders against the United States selective service law (U. S. Comp. Stats. 1918, U. S. Comp. Stats. Ann., Supp. 1919, secs. 2044a–2044k). The defendant Slaughter, as sergeant of police, was in charge of this squad. Neither he nor defendant Butler, the chief of police, was directly concerned with the plaintiff's arrest. They were at no time personally present, did not authorize, and took no part in directing or making the arrest, and were not parties to the incarceration or detention of the plaintiff. Under these facts the judgment against these two defendants was clearly erroneous. In attempting to uphold the contrary view of the trial court, reflected in its findings and judgment, respondent relies upon the doctrine of *respondeat superior;* but that principle of law has no application to the facts in this case. There is a well-defined exception to the general rule which renders one responsible in a civil action for the tortious acts of those employed by or under him. [1] A public officer is not responsible for the acts or omissions of subordinates properly employed by or under him, if such subordinates are not in his private service, but are themselves servants of the government, unless he has directed such acts to be done or has personally co-operated therein. (23 Am. & Eng. Ency. of Law, 382; Story on Agency, sec. 319; *Robertson* v. *Sichel,* 127 U. S. 507–515 [32 L. Ed. 203, 8 Sup. Ct. Rep. 1286, see, also, Rose's U. S. Notes]. See, also, note to 12 Ann. Cas. 184.) [2] In opposition to this principle of law we are cited to those instances in which a sheriff has been held responsible for the acts of his deputies,

but the respondent loses sight of the distinction between the two situations, which is recognized in the decisions. A sheriff is responsible for the acts of his deputies, for they are acting in his private service and in his name and stead, and are only public officers through him. The deputy is not the agent or servant of the sheriff but is his representative, and the sheriff is liable for his acts as if they had been done by himself. (*Foley* v. *Martin,* 142 Cal. 256, 260 [100 Am. St. Rep. 123, 71 Pac. 165, 75 Pac. 842].) A different rule prevails in the case of the chief of a municipal police department. He may even be charged with the duty of selecting the members of the force, but he is not responsible for their acts, unless he has directed such acts to be done, or has personally co-operated in the offense, for each policeman is, like himself, a public servant. (*Casey* v. *Scott,* 82 Ark. 362 [118 Am. St. Rep. 80, 12 Ann. Cas. 184, 101 S. W. 1152].) The question was squarely presented and considered in this last case. An ordinance of the city of Texarkana provided for a dog tax and the manner of collecting the same. It contained a provision that the chief of police of the city should employ a dog-catcher whose duty it should be to enforce the ordinance. The action was one brought against the chief of police, the dog-catcher appointed by him, and the city for the negligence of the dog-catcher. On an appeal by the chief of police from a verdict directed against him and the dog-catcher, the court said that in so far as the relation of the appellant to the action was concerned, the dog-catcher was a public servant selected by the chief of police, just as a patrolman would be selected by him or a mayor, or other appointing power, and held "there is no liability in such case, unless the appointing officer fails to exercise reasonable care in the selection of the appointee, a question not presented." (See, also, a case somewhat in point, *Baisley* v. *Henry,* 55 Cal. App. 760 [204 Pac. 399].)

[3] Aside from the general consideration of this principle of law there is a very particular reason why its effect should have application in this case. The charter of the city of Los Angeles (Stats. 1911, p. 2107), section 91, establishes a department of the government of the city, to be known as the police department, which shall be under the management and control of three commissioners to be known as the board of police commissioners. Section 93 of the charter provides

that the department shall consist of the chief of police, who shall be appointed by and be subject to removal by the mayor, and as many subordinate officers, and such policemen, detectives, and employees as the city council shall by ordinance determine. All appointments in the department shall be made by the chief of police, subject to approval by the board of police commissioners, and subject to such civil service regulation as may be in force at the time the appointments are made. By other sections of the charter (secs. 229–254) all the members of the police department, excepting the chief of police and his secretary, are subject to civil service. When any appointments are to be made in the department the chief, as head of the police force of the city, must notify the Civil Service Commission (Charter, sec. 238) of the fact, and the commission thereupon certifies to him the name and address of one or more candidates, not exceeding three, standing highest on the register for the class or grade to which the appointment is to be made. From these eligibles the chief must make the appointments. Aside from the limitations thus placed upon the chief in the selection of his subordinates, his control over the members of the force, after appointment, is also subject to the limitation that while he may remove members of the force for cause, such removal is subject to review by the police commission. These provisions of the charter plainly determine the status of the chief in the police department. He is a member of the department and a public servant like every other member, but by reason of his position is charged with the supervision and control of the police force of the city. (Charter, sec. 53.) In this capacity he may not be held liable in damages for the unlawful acts and omissions of the subordinates of the department, selected pursuant to the provisions of the charter, unless it can be shown that he has directed such acts or personally co-operated therein.

It is interesting to note in this connection that the framers of the charter of the city of Los Angeles recognized the line of demarkation which fixes the responsibility of the chief of police of the city for the acts of his subordinates. By section 54 of the Charter the chief of police, aside from his duty to supervise and control the police force of the city, is made "the principal ministerial officer of the corporation," with certain prescribed duties relating to service of processes

of the police courts, similar to those performed by constables and sheriffs. As such ministerial officer he may, with the approval of the board of police commissioners, select and appoint one or more *deputies* from the police force, for whose official acts the charter expressly provides he shall be responsible.

What we have said disposes of the contention that the defendant Butler, as chief of police, is liable to the plaintiff in the instant case. [4] The question as to the liability of defendant Slaughter also depends entirely upon whether he directed, or participated in, the acts complained of. As a sergeant of police he was in charge of a detail of seventeen members of the force known as the "war squad," the duties of which have already been mentioned. So far as the record discloses, he gave no general or specific directions to either of the defendants, Smith and Gross, who were members of the "war squad," which would lead, or led, to the apprehension and detention of the plaintiff. It appears that the arresting officers acted without any special instructions in the matter, and assumed authority to both arrest and release the plaintiff. Slaughter had no knowledge of the arrest until he read a report of the occurrence made by Smith and Gross. We fail to see how he can be held liable under such circumstances.

[5] This brings us to a consideration of the question whether or not there was sufficient justification, under all the circumstances, to warrant the arrest and detention of the plaintiff by the defendants Smith and Gross. It occurred during the great World War. On June 5, 1918, the plaintiff, a young man twenty-four years of age, and unmarried, registered with local board No. 1 at Oakland. Under the provisions of the Selective Service Act he was entered as a class A–1 man, which meant that he was subject to immediate call for service in the United States army at any moment. In August he went to the city of Los Angeles, where his parents resided, but failed to obtain from his local draft board any evidence that he had notified it of his change of address. On the morning of October 28th he went to an employment office and asked to be given temporary employment, stating that he was expecting to be inducted into service at any time. The man in charge questioned him as to his standing under the draft, whereupon he showed his regis-

tration and classification cards.   He was told to "wait a minute," and in a short time the defendant Gross appeared. He took the plaintiff's registration cards, placed him under arrest, and conducted him to the police station, where they met the defendant Smith.   The two officers took the plaintiff to the property clerk's office, where he was searched, after which he was locked up in the city jail.   He was informed that he would be detained until his local board was notified by wire of his whereabouts.   Such a telegram was sent the same day, and an answer was returned the next day to the effect that he had not been called, and asking that the plaintiff keep in touch with his board.   The plaintiff was released to his father the day following his arrest, upon assurance being given that he would appear whenever wanted.   There is no contention that the arresting officers acted with malice.

[6]  Whether there is probable cause for making an arrest depends upon all the circumstances of each case, including delay which might enable the guilty person to escape, the nature of the information, the character of the person at whose instance the alleged wrongful arrest is made, and the extent of possible inquiry as to facts and circumstances. (19 Cyc. 352.)   The defendants apprehended the plaintiff as a deserter from the United States army.   They had a right to make the arrest without a warrant for the purpose of delivering him "to any person in the military service entitled to receive him."   (U. S. Comp. Stats., sec. 2296, Act June, 1890, c. 426, sec. 3.)   He was registered as a class A-1 man with a local board at Oakland.   For him to remove from that district without notifying his local board of his new postoffice address would be a violation of section 92 of the selective service regulations, and consequently a misdemeanor (Act of May 18, 1917, secs. 4 and 6 [Supp. of 1919 to U. S. Comp. Stats. 1916, secs. 2044D and 2044F]), and to fail to report to the local board after, notice so to do had been received, with intent to evade service, constituted the registrant a deserter.   (*Farley* v. *Ratliff,* 267 Fed. 682.)   The question to be decided, then, is this: Did the defendants, under the circumstances related, have reasonable ground to believe that the plaintiff was a deserter?   [7]  Probable cause may be defined as a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true.   (*Potter* v. *Seale,* 8 Cal.

217, 221.) **[8]** The court must determine, as matter of law, whether the facts and circumstances as they appear, or are found to exist, constitute probable cause. (*McKenna* v. *Heinlen*, 128 Cal. 97, 100 [60 Pac. 668]; *McCarthy* v. *De Armit*, 99 Pa. St. 63.) Hence we are not bound by the conclusion of the trial judge on that point. That the plaintiff was nearly five hundred miles away from his local draft board is admitted. He had no evidence about him that he had notified his local board of his new address. That he failed to inform the officers that his parents lived in Los Angeles is undisputed, although there is a conflict as to a number of other matters the plaintiff testified he told the officers. When he left Oakland, August 18, 1918, he had been instructed, so he testifies, that he might be called in two weeks or two months. Both dates had passed at the time of the arrest. The police department of Los Angeles had on file hundreds of desertion cases from different boards all over the country, and some from army camps as well. Police departments the country over were warned by the government to be on constant watch to apprehend such men wherever found. Many of these reports gave no description of the men wanted. The defendants had no personal knowledge of the plaintiff, and it is obvious from all the circumstances of the case that the arrest was made in a belief that there was probable cause for the detention of the plaintiff as a deserter.

In measuring the conduct of the officers it is important to bear in mind the unusual situation at the time. The government had called millions of young men to service under the Selective Service Act. The plaintiff was of an age and class, all of whom had already been called, or were about to be. He actually received his induction papers within two weeks after his arrest, which would indicate that his call was imminent at that time. The usual presumption of innocence of crime was in a large measure overcome in this case by the age and classification of the plaintiff, and when to this was added the fact that he was so long a distance from his place of registration without any evidence to show that his whereabouts was known to the local board, it would appear that there was clearly probable cause for believing that he was a deserter within the meaning of the Selective Service Act. He could have avoided the unpleasant situation in which

he was placed by adopting either one of two simple expedients.  He could have obtained from the local board in Oakland documentary evidence that he had notified it of his change of address, and was absent from its jurisdiction with leave.  Being so far distant from his local board as to make it a hardship for him to respond and comply with its notices, or to perform any duty under the selective service law, or the draft regulation, or expecting to be at such distance, he should have applied to the Oakland board to have his classification and all future procedure in respect of himself transferred to a local board in Los Angeles.  (Sel. Ser. Reg., sec. 144.)

The war is over and the right of a police officer to arrest a deserter is now a comparatively unimportant question, but it was a most vital matter when this occurrence took place. In view of the facts in this case, and in the light of the neglect of plaintiff to take the simple steps which he might have taken to prevent what occurred, we think it would be unjust to hold the defendants Smith and Gross liable for their action in the matter.  We have been unable to find any case in which a charge of false arrest has been sustained where officers had made an arrest under such circumstances.

In the case of *Boatwright* v. *State,* 120 Miss. 883 [83 South. 311], the defendant killed the constable who sought to arrest him for desertion.  He was tried for murder, and on the trial requested an instruction to the effect that the constable had no right to arrest him for such cause.  In that regard the court said: ''The testimony in the present case shows that Mr. Culpepper [the constable] knew Beeman Boatwright [the alleged deserter]; that appellant [the deserter] also knew the officer; and that the officer, at the time he undertook to arrest appellant, did not merely have a suspicion that appellant was a deserter, but was confident of the fact, and there is no dispute in the record that appellant had in fact left his post of duty at a time when our government was at war.  The testimony of the state further tends to prove that appellant resisted arrest, and in so doing exhibited and used a deadly weapon.  We are of the opinion that it was not only the right, but the duty, of the constable, under such state of facts, to place appellant under arrest, and his action in doing so needs no apology.  The officer in this case was backed and protected by the law of

the land, and surely the law cannot be defied.'' In weighing the effect of this decision it should be noted that the fact of desertion is not a determining factor in the case, for the officer could not know what the fact in that regard might ultimately be shown to be. The case, in effect, holds that if an officer knew a party and was confident that he was a deserter, it was his duty to make the arrest. If we apply the principle of that decision to this case, it is clear the defendants were not guilty of a false arrest.

The plaintiff testified that he told the officers at the time of his arrest that he had notified his local board of his new postoffice address. Both officers testified that he stated that he had not notified his local board of his change of address, and that the fact was entered upon the police blotter in stating the cause of his detention. The trial court, in order to reach the conclusion it did, must have disbelieved the testimony of the officers and accepted that of the plaintiff. Assuming, however, that the defendants were otherwise justified in the arrest of the plaintiff as a deserter, it is clear that his mere statement to them that he was not a deserter, or that he had notified the local board of his whereabouts, would neither require nor justify them to refrain from making the arrest. If the plaintiff was a deserter he would, of course, make whatever statements would have best served his purpose in escaping arrest for that crime. If police officers had to accept the word of persons about to be arrested as to their guilt or innocence, few arrests would be made. We cannot do better in this case than to adopt the language of the supreme court of New York in *Hawley* v. *Butler,* 54 Barb. (N. Y.) 490, 504: '' . . . and it is not singular that the person arrested, not being a deserter, protested his innocence in that particular; but a public officer cannot in all cases accept of that as a defense. The guiltiest of felons have made the same protest. It is a safer rule, however, for courts to follow in such cases, to decide whether probable cause is, or is not, shown, than to rely upon the protestations of innocence of the persons arrested. I have never learned, before, that such protestations created a liability upon the arresting officer. And where there is probable cause, whether it appears from extrinsic circumstances, or from the conduct, falsehoods or contradictions of the party

arrested, the officer acting without malice or bad motive, will be protected, if acting in the line of his duty; . . . ''

In that case the court was considering a charge of false imprisonment where the arrest had been made for desertion. The plaintiff had resided in Montgomery County, New York, and returned after an absence of several years in August, 1883, wearing a portion of a soldier's uniform. Soldiers were forbidden by the laws of the United States to sell or dispose of their military outfits. The defendants had been informed by government officers that this long absentee had returned and was in possession of government clothes and was believed to be a deserter. When questioned, he denied having been in the service and denied having any soldier's uniform, but upon further examination he admitted having a uniform and explained how he came into possession of it. Upon these conflicting statements he was arrested and it turned out that he was not a deserter and had never been in the government service. The court, in discussing the matter, made the following observations:

"The question, whether the defendants had probable cause for the arrest upon undisputed facts, is a question for the court, not for the jury. (*West* v. *Baxendale,* 9 Com. B. 141; *Sutton* v. *Johnstone,* 1 Term Rep. 507, 545, per Eyre, Baron.) Per Lord Mansfield: 'If the facts are in conflict, the jury must find the facts, and when found, it is a question of law, whether they amount to probable cause.' (Id.) There is no conflict here, on the trial, as to any material fact in this case. The plaintiff's evidence in this respect agrees with that of the defendants. No point was raised or made on the trial that the arrest was made with motives of malice or oppression. The defendants were public officers. They had public duties to discharge. They were called to act in perilous, arduous and difficult times. They were invested with legal authority to act. The law of the country imposed upon them a public duty, for public purposes. They were punishable for neglect of duty, if they neglected to act in a case where there was sufficient or probable cause for acting. The safety of the government, and the discipline of the army, depended upon their fidelity, and the country was materially interested in their conduct. It was the duty of the court, in such a case, unflinchingly to come up to the standard of duty, and pass upon the questions that had been

committed to, and appropriately belonged to them. It would be a reproach to a court, under such circumstances, if through timidity or a desire to shirk responsibility, they should leave to the jury a question which, by the theory of our law, they are incompetent to try, to wit, whether probable cause for arrest had been shown. It is not only proper for the court, but by the wisdom of the sages of the law the courts are directed to give great latitude in the review of the acts of such officers. In the case of *Wall* v. *McNamara*, tried by Lord Mansfield, sitting at Westminster, in Michaelmas term, 1779, he said: 'In trying the legality of acts done by military officers in the exercise of their duty, great latitude ought to be allowed; and they ought not to suffer for a slip of form, if their intention appears by the evidence to have been upright; it is the same as when complaints are brought against inferior civil magistrates, as justices of the peace, for acts done by them in the exercise of their civil duty. The principal inquiry to be made by a court of justice is, how the heart stood? and if there appears to be nothing wrong there, great latitude will be allowed for misapprehension or mistakes.' See also the sensible remarks of Rosekrans, J., in *Colton* v. *Beardsley* (38 Barb. 29 and 45), and cases cited by him.''

The judgment is reversed as to all the defendants.

Wilbur, J., Shurtleff, J., Shaw, C. J., Lawlor, J., and Richards, J., *pro tem.*, concurred.