[S. F. No. 9544. In Bank.—June 12, 1922.]

## LORENZ STEIN, Respondent, v. MARY E. LACASSIE, Appellant.

[1] APPEAL—CONFLICT OF EVIDENCE—ERRORS OF LAW—DUTY OF APPELLATE COURT.—Where the evidence is conflicting, it becomes the duty of the appellate court to carefully scrutinize the rulings and instructions of the trial court upon matters of law, in order to determine whether any errors alleged to have occurred therein had a prejudicial influence on the verdict.

[2] MALICIOUS PROSECUTION—PROBABLE CAUSE—ERRONEOUS INSTRUCTION.—In an action for malicious prosecution, it was error to instruct the jury that if the criminal proceedings against the plaintiff were instituted by defendant over a fixed and malicious determination of her own, and not from the advice of counsel, or that she did not communicate a full, fair, and true statement of all the facts known to her to the district attorney, and the district attorney did not advise her there was probable cause for the arrest, such conduct would constitute a lack of probable cause, since the defendant might have had abundant cause for procuring the arrest regardless of the advice of counsel.

[3] ID.—REVIEW OF EVIDENCE—SUBSEQUENT INSTRUCTION—ERROR NOT CURED.—Error in giving such instruction was not cured by a later instruction reviewing the evidence from the defendant's point of view, which was much involved in detail and concluded with the direction to find a verdict for the defendant if the jury should find the truth of all the facts asserted therein.

[4] ID.—MALICE AND PROBABLE CAUSE—PROSECUTION WITH OTHER MOTIVE—ERRONEOUS INSTRUCTION.—Where the court had charged the jury that both malice and probable cause must be found to exist before it could render a verdict in the plaintiff's favor, an instruction that the prosecution of a person with any other motive than to bring the guilty person to justice is in law a malicious

prosecution, was erroneous, since it implied that the presence of any other motive was sufficient proof of the elements of malicious prosecution.

APPEAL from a judgment of the Superior Court of Contra Costa County. R. H. Latimer, Judge. Reversed.

The facts are stated in the opinion of the court.

Chas. E. Snook, Snook & Brown and F. P. Tuttle for Appellant.

J. E. Rodgers and A. F. Bray for Respondent.

RICHARDS, J., *pro tem.*—This is an appeal from a judgment in plaintiff's favor in an action to recover damages for alleged malicious prosecution. The cause was tried before a jury. The evidence in the case may be briefly summarized as follows: During the year 1918, and for some time prior thereto, the plaintiff and the defendant lived upon adjoining ranches near Walnut Creek, in the county of Contra Costa. Plaintiff was of German extraction, but was a naturalized citizen of the United States. The defendant's husband was of French extraction. She had herself never met the plaintiff and the evidence is in dispute as to whether there had been prior instances of discord between the two families. On April 23, 1918, the dead body of a horse belonging to the defendant was found by her in an inclosure adjoining the land of the plaintiff. The animal had been last seen alive two days before and was then in good health. Upon the discovery of the death of the horse the defendant sent for a veterinary surgeon, who, on the following day, came to the defendant's premises and examined the body of the animal, cutting it open and finding the intestines punctured, and finding also other evidences of corrosive poisoning, he concluded that the death of the animal had been caused by phosphorus poisoning, and so informed the husband of the defendant, who, in turn, told her. In the colon of the animal the veterinarian also found a dark green substance similar to filaree or clover. On the following day the veterinarian informed Sheriff Veale and his son, who was his under-sheriff, that the horse had been poisoned by phosphorus, and stated his reasons for this conclusion. The

defendant and her husband tracked the animal to a point near the line fence of the plaintiff and noticed that certain strands of wire upon said fence were broken near the point where the tracks of the animal were to be seen. On April 25, 1918, the under-sheriff and a deputy sheriff came to the defendant's premises and examined the dead animal and were informed by the defendant that the horse had been traced to a point near the line fence and had been poisoned with phosphorus, and that she thought that the plaintiff might have poisoned the horse. The two officials then made an examination of the carcass, which led them to believe and state that the horse had been poisoned with phosphorus. They also noticed the dark green substance in the colon of the animal, which had the appearance of chopped alfalfa. The officials then went over to the premises of the plaintiff, where they saw some alfalfa in a pig-pen similar to that found in the stomach of the horse. They then interviewed the plaintiff, who made some conflicting statements as to his possession of phosphorus and also as to his knowledge of the fact that the horse of Lacassie was dead. During this interview with the plaintiff the under-sheriff told him that he believed he had poisoned Lacassie's horse with phosphorus, and upon his return to the Lacassie premises this official informed the defendant as to what he had found upon the plaintiff's premises and of the fact that he believed, and had stated, that the plaintiff had knowledge of the poisoning of the horse. The defendant, upon learning these facts, desired to have the plaintiff arrested, but the under-sheriff informed her that it would be necessary for her to swear to a complaint and that she had better go to Martinez on the next day and confer with the district attorney and her own attorney regarding the matter. He also on the same evening informed the district attorney of his discoveries and belief. On the following day the sheriff, the under-sheriff, and a deputy sheriff went to the Lacassie ranch, and on their way thither met the defendant and her husband coming to Martinez to swear to a complaint, but the under-sheriff advised the defendant that she had better wait for a chemist's report before swearing to a complaint. On April 29, 1918, several samples from the body of the horse were submitted to a chemist, who, some three weeks later, made a report which was rather negative upon the question

of the existence of alfalfa or of signs of phosphorus in the exhibit submitted to him as coming from the body of the dead animal. During the intervening period some correspondence passed between the under-sheriff and the defendant, the latter complaining of the tardiness of the chemist's report, and after it arrived declined to swear to a complaint in the face of its negative finding. On June 10, 1918, matters were brought to a crisis by the discovery of a cow of the defendant lying dead within the premises of the plaintiff, its death having been caused by violence inflicted upon it in some manner. Upon learning of the death of her cow the defendant again called in the veterinarian, who examined its body. She also sent for the under-sheriff, who looked over the body of the cow and interviewed the plaintiff as to his knowledge of the cause of its death, and after doing so advised the defendant to go to Martinez and lay the facts before the district attorney. She went to the county seat and had an interview with the district attorney, who offered to draw a complaint for her to sign. She had an angry dispute with the under-sheriff over some of the facts in the case, and finally left the office of the district attorney without signing the complaint, but later returned and had a further interview with the district attorney, who told her that if she wanted to swear to a complaint he would draw it up, but it would be difficult to get a conviction. The complaint was finally drawn in the district attorney's office, whereupon the under-sheriff, the defendant, and her husband went to the office of a justice of the peace, where the complaint was sworn to and filed, and a warrant for the arrest of the plaintiff upon the charge of poisoning the defendant's horse was issued. The plaintiff was arrested thereon and put to trial, when he was acquitted of the charge. Thereupon he commenced this action.

[1] The foregoing is merely a summary of certain salient facts of the case. There is much other evidence bearing upon the defendant's mental attitude toward the plaintiff herein and her good faith in instituting the proceedings against him. The evidence was conflicting as to many of the essential features of the case. It is one of those cases wherein the verdict of the jury either way would find substantial support in the evidence. This being so, it is not the province of this court to usurp the function of the jury in

cases of this character. (*Runo* v. *Williams*, 162 Cal. 449. [122 Pac. 1082].) We cannot, therefore, uphold the appellant's contention that the evidence is insufficient to justify the verdict, even though we might be disposed to conclude from a review of the record that the evidence preponderates in the appellant's favor. In such a case, however, it becomes the duty of this court to carefully scrutinize the rulings and instructions of the trial court upon matters of law in order to determine whether any errors alleged to have occurred therein had a prejudicial influence upon the verdict. The trial court, at the plaintiff's request, gave the following instruction:

[2] "You are instructed that if you find from the evidence in this case that the criminal proceedings against plaintiff were instituted by defendant over a fixed and malicious determination of her own, and not from the advice of counsel, or that she did not communicate a full, fair and true statement of all the facts known to her to the sheriff and the district attorney, and that the district attorney did not advise her there was probable cause for the arrest, then such would constitute lack of probable cause."

It would seem to require no argument to show that this instruction is erroneous, and is prejudicially so, since it might well be that the defendant herself might have had abundant cause for insisting upon and procuring the plaintiff's arrest upon the charge of having poisoned her horse, even though, in so doing, she was acting upon a fixed and malicious determination of her own and without the advice of counsel; and even though she had not communicated all of the facts known to her to the sheriff and district attorney, or made a full, fair, and true statement of the facts to these officials; and even though the district attorney had not advised her that there was probable cause for the plaintiff's arrest. [3] Nor do we find that this error has been corrected in any other or later instruction. There is a later instruction in which the trial court makes a review of the evidence in the case from the defendant's point of view. It occupies several pages of the record, is much involved in detail, and concludes with the direction to the jury that if they shall find all of its asserted facts to be true they should find a verdict for the defendant. But this instruction cannot be held to have removed the sting of the former instruc-

tion wherein the court had already erroneously charged the jury that upon a few facts clearly and tersely stated they were bound to find that the defendant had acted without probable cause in bringing about the plaintiff's arrest.

[4]　The trial court wandered further in the path of error in giving the following instruction: "You are instructed that the prosecution of a person with any other motive than to bring the guilty person to justice is in law a malicious prosecution."

The chief vice of this instruction consists in its use of the term "malicious prosecution," since this term has in law a technical meaning, embracing the twofold elements of malice and want of probable cause. The court had already, in substance, charged the jury that both of these elements must be found by the jury to exist before it could render a verdict in the plaintiff's favor; yet in the instruction last above quoted the jury is told in plain terms that the prosecution of a person with any other motive than to bring the guilty person to justice is sufficient in itself to constitute in point of law a malicious prosecution; or, in other words, to furnish sufficient proof of both of the foregoing elements to justify a verdict in the plaintiff's favor. It cannot with reason be contended that instructions such as these, so obviously erroneous, and yet so tersely put as to be easily comprehensible by the jury, were not prejudicial, or that the verdict of the jury, in a close case like this, would not be injuriously affected thereby. In the case of *Runo* v. *Williams, supra,* this court has stated: "The law is clearly and definitely settled how a jury shall be instructed in the cases of this character (*Grant* v. *Moore,* 29 Cal. 644; *Harkrader* v. *Moore,* 44 Cal. 144; *Eastin* v. *Bank of Stockton,* 66 Cal. 123 [56 Am. Rep. 77, 4 Pac. 1106]; *Fulton* v. *Onesti,* 66 Cal. 575 [6 Pac. 491]; *Ball* v. *Rawles,* 93 Cal. 222 [27 Am. St. Rep. 174, 28 Pac. 937]; *Smith* v. *Liverpool Ins. Co.,* 107 Cal. 433 [40 Pac. 540]; *Scrivani* v. *Dondero,* 128 Cal. 31 [60 Pac. 463])."

To this list of cases may be added the recent decisions of this court in *Burke* v. *Watts,* 188 Cal. 118 [204 Pac. 578], and *Michel* v. *Smith,* 188 Cal. 199 [205 Pac. 113].

Since this case must go back for a new trial, the parties and the court should have no difficulty whatever, in the light of the foregoing authorities, in formulating and giving to

the jury clear and definite instructions governing their duties in considering their verdict.

The judgment is reversed.

Wilbur, J., Sloane, J., Shaw, C. J., Lennon, J., Lawlor, J., and Shurtleff, J., concurred.