[Civ. No. 4991. Third Appellate District.—November 29, 1933.]

WILLIAM O. ALLEN, Respondent, v. CHARLES J. Mc-COY, as Sheriff, etc., et al., Appellants.

Rich, Weis & Carlin for Appellants.

W. E. Duncan, Jr., and George F. Jones for Respondent.

THOMPSON, J.—The defendants have appealed from a judgment rendered against them pursuant to a verdict which was returned in a suit for false imprisonment.

In response to a message by telephone from the sheriff of Sacramento County to arrest two men and a woman belonging to a well-known criminal organization known as the "Weston Gang", who were fleeing in an automobile, the Sheriff of Yuba County sent Merrill Le Boeuf, a city police officer, out to intercept them. The officer stopped the car in Marysville about 10:30 P. M., Saturday, October 8, 1932. It contained the three fugitives. Upon a command to surrender, the men got out on opposite sides of the machine. Armed with a rifle, one of them walked around the rear end of the car and commanded the officer on penalty of death for refusal to do so to get into the rear seat of the automobile. He complied with the order. The bandits promptly re-entered the car, and fled with the police officer as their prisoner. One of the men sat by his side armed with a loaded rifle. During the brief flight which followed, his life was repeatedly threatened. There is little doubt he was in serious danger of being killed. The fugitives drove north toward Oroville. When they reached a point near Gianella's Corners, they passed the machine of Sheriff Toland of Butte County, which was parked by the roadside with the lights extinguished. He had also been informed of the flight of the criminals, and was lying in wait for them. The sheriff immediately gave chase. Observing the pursuit of the sheriff's machine, the speed of the

fugitives' car was greatly increased. After traveling at a terrific rate of speed for about a mile, the foremost car was turned at an acute angle in an attempt to take an unfrequented side road. The car was overturned and wrecked. On account of the darkness, the three fugitives escaped in the adjacent timber and brush. In the casualty, the woman lost a shoe. In their haste to escape the police officer was left in the wreck. This accident occurred about midnight. When Toland arrived the officer was just emerging uninjured from the wreckage. A hasty examination of the wrecked car disclosed the presence of a loaded and cocked rifle, some cartridges, several robbers' masks, a bottle of whisky, the lost shoe and other paraphernalia. After a fruitless search for the fugitives, the officers hastened to Oroville and notified Sheriff McCoy of the kidnaping of Police Officer Le Boeuf and of the escape of the bandits. The defendant McCoy promptly summoned three of his deputies and in company with two other highway patrolmen and a forest ranger, they continued to search for the fugitives all night and during the entire forenoon of the following day. No trace of them was found.

About 1 o'clock the following day the officers all visited the scene of the wreck once more for the purpose of making a more detailed examination of the premises. They were then told of the presence of foot tracks along a dirt road several miles away near the Simpson ranch. The entire posse, including Sheriff McCoy, his deputies, and a number of other men, immediately went, in four or five automobiles, towards the Simpson ranch. They soon discovered the tracks of the fugitives going southerly along a dusty dirt road. The tracks were positively identified as those of the bandits from the fact that they included those of one individual having small feet, with one shoe missing. These tracks were closely examined, identified and followed for a distance of more than a mile to a gate leading into the Simpson ranch. While they were examining these tracks, before reaching the gate, a member of the party by the name of Hunt, who lived in that neighborhood, told Sheriff McCoy he would find his parties in an old abandoned cabin which stood a distance of about 500 feet from the road among the trees; that a couple of strangers had been seen in there during the past few days. Several witnesses testified these

foot tracks led directly to the gate. Sheriff McCoy said he just assumed the fugitives were staying in the cabin and that he did not attempt to trace the tracks beyond the gate. Half a dozen witnesses testified regarding these facts. All agreed that the footprints included those of one individual without a shoe. Everyone in the party assumed they had succeeded in locating the fugitives. It appears to have been mutually conceded by all that the fugitives were probably concealed in the old cabin. Some advised surrounding the field and approaching the cabin from various points. The sheriff decided that they would go through the gate and directly to the cabin. The party consisted of from ten to fifteen individuals, including the sheriff, several deputy sheriffs, one or more police officers, two traffic officers in uniform, a forest ranger in his khaki clothes, together with several other persons. The sheriffs and deputies wore their badges of office in plain view. The traffic officers also wore their badges together with the belts and revolvers which they were accustomed to wear. The posse filed through the gate in procession with at least four automobiles, parking their cars at different points within 75 to 100 feet of the cabin, which was a small board shack 12 by 16 feet in size with walls about 10 feet in height to the point of the eaves. The building had but one small window on the side, which was boarded over on the outside. A single door opened at the end fronting toward the gate. In front of this door there is a small outside porch about 7 feet in size, which is elevated 3 feet above the ground. It was 3 o'clock in the afternoon of the day following the kidnaping of the officer when the posse entered the gate and surrounded the cabin.

The plaintiff and his partner had been occupying this cabin for several days past. They were strangers in that community. They had lately driven through from Arizona. Their automobile was parked near the cabin under a tree. The plaintiff's companion was absent taking a bath in the stream near by. The plaintiff testified that he was an honorably discharged soldier of the World War; that he had suffered shell-shock and was extremely nervous on that account; that he sat in the cabin writing a letter when the posse arrived. He looked out through the door and saw at least three automobiles and a number of men coming through the gate; he continued writing his letter, expecting them

to call at the door. After parking their cars, Sheriff McCoy, armed with a short shotgun loaded with buckshot, and his two deputies, Wilcoxon and Barrett, each armed with rifles, all three of whom had their official badges plainly displayed, were the first to reach a point 15 or 20 feet from the door of the cabin. At the same time, Traffic Officers Richardson and Couch, in full official uniforms, and armed with revolvers approached a short distance behind the defendant McCoy. At that moment the plaintiff appeared on the front porch to ascertain the unusual occasion of the visit of this group of men. Half a dozen witnesses testified that McCoy promptly commanded him to "put up your hands", with the further declaration, "We are officers."

The plaintiff denies that he was informed they were officers. One other witness corroborates him in that regard. Instead of throwing up his hands the plaintiff immediately disappeared through the doorway of the cabin. Several witnesses said "he ducked into the cabin". The plaintiff said he was surprised and frightened and fell backward into the open door. After demanding that the plaintiff and his associates come out and surrender, Sheriff McCoy fired three charges of buckshot toward the cabin. One charge of shot took effect in the boards which covered the window at a point five feet above the floor. Another charge took effect in the side of the building four and a half feet above the floor. The third charge was fired into the ground at the bottom of the building. Two rifle shots were fired into the gable or roof of the building. The officers said they were trying to fire their guns so as to avoid hitting the inmates of the cabin, but with the purpose of frightening them to induce their surrender. Several witnesses testified that the officers repeatedly demanded the surrender of the inmates of the cabin, with the statement that they were officers. During the bombardment the plaintiff lay upon the floor of the cabin. He claimed to have been hit by a stray shot. Several witnesses examined his body and his undershirt to determine whether he had been actually hit. A red spot was found on his side, which appeared to be a mere pimple. There was no blood present. An examination of his shirt disclosed no evidence that it had been penetrated by a shot. The shirt was not presented in court. The evidence is very

persuasive that he was not hit by a shot. He admitted that he was not hurt "to amount to anything".

After the several shots had been fired, the plaintiff again appeared on the front porch, and while one of the officers kept him covered with a gun, the defendant McCoy placed handcuffs on his wrists. The officers repeatedly demanded that his companions should come out and surrender. He was asked "Where is the woman?" The plaintiff told them there was no woman in the cabin. He said his partner had gone to the stream to swim. After his arrest, the cabin and his automobile which was parked under a tree behind the building were immediately searched. Within a few minutes the sheriff returned from his inspection of the plaintiff's car and declared they had made a mistake in arresting the plaintiff. After talking with him a few moments, the handcuffs were removed. The sheriff apologized for the mistake, and explained that they were pursuing three desperate criminals whom they had tracked to that vicinity. The plaintiff assured the sheriff that he was all right and that no harm had resulted. They laughed good-naturedly, shook hands and parted.

This suit for false imprisonment was subsequently commenced. The cause was tried with a jury. A verdict of $500 was returned against the defendants. A judgment for that amount was accordingly rendered. From that judgment the defendants have appealed.

The only question which is involved in this appeal is whether the sheriff arrested the plaintiff in good faith, actually satisfied, or with probable cause and good reason to believe that he was one of the criminals whom they sought for the kidnaping of the police officer. "Probable cause" is defined as "a suspicion founded upon circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true". (*Michel* v. *Smith*, 188 Cal. 199, 205 [205 Pac. 113, 166]; *Murphy* v. *Murray*, 74 Cal. App. 726, 731 [241 Pac. 938].) Without any question of a doubt, the sheriff did firmly believe the plaintiff was one of the fugitives who had kidnaped the policeman, and whom they had tracked to the very entrance of the premises where the deserted cabin stood. Every act and utterance of the arresting officers indicates that not only did the sheriff honestly believe they had apprehended one of the criminals they were

pursuing, but every other individual in the posse also believed that fact. They had been notified by the sheriff of Sacramento County to look out for an automobile with an Arizona plate, containing two men and a woman, and arrest them. The sheriff dispatched the policeman, Le Boeuf, who succeeded in locating them. In an effort to place them under arrest, he was kidnaped and taken away in their machine. In pursuit of their machine by the sheriff of Butte County it was overturned and wrecked within six miles of the cabin where the plaintff was arrested. The fugitives managed to escape. The woman disappeared with the loss of one shoe, which was found in the car. It is true the defendant McCoy did not then know that they belonged to the notorious Weston gang of outlaws, but an examination of their wrecked car disclosed the fact that they were robbers and dangerous criminals. The officers found in their machine a cocked gun with which the kidnaped officer was held prisoner, and several masks which are used by professional robbers. The pursuit of the fugitives continued without cessation throughout the night and the following forenoon. In the afternoon they discovered in the dust of a dirt roadway near by the foot tracks of two men and a woman having one shoe off. They traced these tracks directly to the gate entering the premises where the deserted cabin stood. No inmate of the cabin was in sight. When the plaintiff did appear on the front porch and was commanded to surrender, he immediately disappeared inside the cabin. Apparently every individual member of the posse thought they had discovered the kidnapers whom they were pursuing. Certainly the sheriff, McCoy, had reasonable cause to honestly believe the plaintiff was a member of the criminal gang which he sought to apprehend. Not a single circumstance disclosed by the record indicates that anyone in company with the sheriff doubted they had captured one of the kidnapers of the police officer. It was a clear case of mistaken identity. The defendant was innocent of any wrong.

An officer is not liable for false imprisonment for the arrest without a warrant of a person who he has reasonable grounds to believe is guilty of a crime. The question of the existence of probable cause to believe that one is guilty of a crime must be determined as a matter

of law from the facts and circumstances of the case. On appeal, this court is therefore not bound by the conclusions of the trial court in that regard. (*Michel* v. *Smith*, 188 Cal. 199, 206 [205 Pac. 113]; *Murphy* v. *Murray*, 74 Cal. App. 726, 730 [241 Pac. 438]; *Mackie* v. *Ambassador Hotel etc. Corp.*, 123 Cal. App. 215, 220 [11 Pac. (2d) 3]; 25 C. J. 471, sec. 36, p. 550, sec. 159.)

 It is contended the arresting officer failed to inform the plaintiff of the charge against him, or of the authority to make his arrest, as required by the provisions of section 841 of the Penal Code. That section provides that:

"The person making the arrest must inform the person to be arrested of the intention to arrest him, of the cause of his arrest, and the authority to make it, except when the person to be arrested is actually engaged in the commission of or an attempt to commit an offense, or is pursued immediately after its commission, or after an escape."

It is asserted the circumstances of this case do not fall within the exception mentioned in the foregoing section, exempting an officer from the necessity of declaring his authority to make the arrest, when one "is pursued immediately after the commission" of an offense, since sixteen hours had elapsed from the time of the kidnaping until the plaintiff was handcuffed. We are of the opinion there is no merit in this contention. The sheriff and his posse were in actual continuous pursuit of the kidnapers from the time they were notified of the crime until the plaintiff's arrest. Several hours of darkness intervened. They did not discover the tracks of the fugitives until the afternoon of the following day. Under the circumstances of this case we have no hesitancy in saying the pursuit never ceased until the arrest of the plaintiff occurred.

 Moreover, the authority of the officer and his intention to make the arrest were sufficiently indicated. Several witnesses testified that the defendant McCoy said to the plaintiff "Throw up your hands, we are officers." The plaintiff denied that he was told they were officers. Assuming there is a substantial conflict of evidence in that regard, there was no necessity of telling him they were officers when he could plainly observe that fact for himself. (*People* v. *Pool*, 27 Cal. 572; *State* v. *Evans*, 161 Mo. 95 [61 S. W. 590, 84 Am. St. Rep. 669]; 5 C. J., 419, secs. 49, 50.) An

officer is not obliged to notify the accused of his official capacity before making an arrest, when it is known to the accused or when by the exercise of ordinary reason he should have known it. In commenting on the effect of a statute requiring an arresting officer to disclose his identity and purpose at the time of taking an accused person into custody, it is said in 5 C. J., at page 420:

"Some decisions and statutes in terms require the officer in making an arrest to give notice of his authority, intention and the cause of the arrest; but this probably means no more than that such notice must be given at the time or upon the occasion of the arrest, and not necessarily before taking the person into actual or potential custody. It is sufficient if such notice is given upon the occasion of the arrest, at the earliest reasonable opportunity."

The plaintiff must have known he was being arrested by officers. One sheriff and two deputies faced him at a distance of 15 or 20 feet with their official badges plainly displayed. Two highway traffic officers, in full uniform, were present with their badges displayed, and their belts and pistols in plain view, only a few feet behind the sheriff. The plaintiff had seen several automobiles and the entire group of men enter the gate. It is unreasonable to concede he was warranted in believing he was the victim of a band of robbers. Bandits do not travel in such imposing processions and garb to hold up remote dilapidated cabins in the hope of securing loot. There was no violation of the provisions of section 841 of the Penal Code in making the arrest in this case. ■ Moreover, the mere departure from the strict statutory method of making an arrest as prescribed by that section does not necessarily impose liability upon an officer for false imprisonment. While all innocent persons should be adequately protected, with the alarming prevalence of kidnaping and crime in many modern forms, our peace officers should not be discouraged in the performance of their duties by too technical a construction of legal procedure. The chief question in the present case is whether the sheriff in good faith exercised reasonable care and honestly believed he was performing his official duty in arresting one of the kidnapers he was engaged in pursuing. We are perfectly satisfied he did, and that, under the undis-

puted facts of this case, as a matter of law he is not liable for false imprisonment.

The judgment is reversed.

Pullen, P. J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 29, 1933, and the following opinion rendered thereon:

THE COURT.—The petitioner contends that the recitation of facts is inaccurate and unfair. We think not. In view of the criticism, we deem it advisable to cite the record in support of the particular challenged statements of facts. Petitioner denies that the door of the cabin opens toward the gate as alleged in the opinion. The plaintiff himself testified in that regard: "I was engaged in writing a letter, . . . I heard two or three automobiles, and it seemed as though they had stopped out on the road. . . . I stepped to the door with my pen in hand and looked out and I seen three cars . . . at the gate, and a man opening the cattle gate." This is material, only, to show that the plaintiff was aware of the approach of the officers. He admits that he saw them coming through the gate from the open doorway.

The size of the front porch was inaccurately estimated. Unfortunately the diagram of the cabin which was used at the trial was not brought to this court on appeal. The discrepancy is, however, slight. We called it an 8-foot porch. It is conceded the cabin is 12 by 16 feet in size. The plaintiff testified that "the porch landing is possibly 2½ feet from each corner of the cabin". This leaves at least a 7-foot porch. The record has been changed to conform to that estimate.

Petitioner challenges the statement that the plaintiff's car was parked near the cabin *under a tree*. Sheriff McCoy testified in that regard, "The machine was further over to the right; there is a tree there, and the machine was under the tree." The forest ranger, Mr. Ruth, said it was parked "fifty or sixty feet below the cabin". Its exact location is not of great importance.

It is asserted the court was not warranted in saying that the sheriff and his deputies, with their official badges plainly

displayed and armed with weapons, approached the cabin. Several witnesses substantially so stated. The sheriff testified in that regard: "Q. Did any of your officers have badges on that day? A. Yes, Mr. Wilcoxon had a badge in sight, and the Deputy Sheriff, Richardson, had a tan shirt and star on it,—a deputy sheriff badge, and John Couch, the Traffic Officer, was dressed in full uniform with a badge on, and also his six shooter strapped to his side, . . . and Clarence Ruth, of the Forest Service, I think had on a pair of regulation forestry pants and shirt. . . . I had a badge on myself, and it was on my vest." He further testified in regard to their uniforms: "John Couch, Harvey Richardson, Paul Barrett, Phil Wilcoxon, Lawrence Ruth, Merle Reams, and a man named Tom Hunt (were there). . . . There were eleven without Boras . . . including four of our deputies." This statement was followed by the evidence of the respective officers showing that Couch was a traffic officer in uniform; Richardson was a highway patrolman and deputy sheriff; Barrett was a deputy sheriff who wore his badge; Wilcoxon was also a deputy sheriff who wore his badge, and Ruth was a forest ranger, but it does not appear whether he was in uniform or not. The evidence is very convincing to the effect that a formidable posse of armed and uniformed officers approached the cabin. It seems improbable that any reasonable person should fail to recognize them as a group of peace officers.

The statement in the opinion that the officers did not fire to hit the inmates of the cabin, but rather to induce them to surrender, is challenged as untrue. The sheriff fired two charges of buckshot into the building after the plaintiff "ducked into the cabin". One charge took effect in the boards over the window 5 feet from the ground. The other charge took effect 4½ feet from the ground. Standing on the ground near by, the course of the charge would be upward. The third charge was fired into the ground at the base of the building. Two rifle shots were fired into the gable or roof of the building. The plaintiff was not hit. Regarding his purpose in firing into the building, the sheriff said, "When he dove in (the cabin) I fired a shot at the window; I naturally thought he was going after a rifle. . . . I didn't want to kill him; I could have killed him right there on the porch. . . . I never shot at Allen or at the

door; . . . the first shot was against the window, and the second shot was lower down, and the third shot did not strike the cabin. . . . I was satisfied in my own mind that the Weston gang were in that cabin. . . . I didn't intend to shoot the man. . . . I was going to keep him away from the window. . . . I wanted him to come out of the cabin."

It would have been unfortunate if the plaintiff had been hit. The only material question to be determined in this case is whether the sheriff in good faith handcuffed the plaintiff with reasonable cause to believe that he was one of the kidnapers whom he sought to arrest. If he had shot to kill the inmate of the cabin, it might have been stronger evidence corroborating his claim that he thought he was a member of the desperate Weston gang. The evidence is satisfactory to the effect that the sheriff did not shoot intending to kill or injure the plaintiff.

The petitioner says: "There isn't a bit of testimony in the record . . . that the tracks led from the gate to the cabin, nor that the sheriff followed the tracks to the cabin." The opinion does not so state. It merely states: "These tracks were . . . followed for a distance of more than a mile *to the gate* leading into the Simpson ranch. . . . Sheriff McCoy said he just assumed the fugitives were staying in the cabin and that *he did not attempt to trace the tracks beyond the gate.*" This is an accurate statement of the undisputed record, most favorable to the plaintiff.

It is insisted the record does not support the statement that a loaded rifle was found in the wrecked car of the kidnapers. This charge seems trifling. Sheriff McCoy testified in that regard, "When (we reached) the car that turned over I told Mr. Wilcoxon to get in the car and search it, . . . and in the car *he found a gun loaded and cocked,* and also a box of rifle (shells) were found in the car." Mr. Wilcoxon testified, "I found a lot of masks, a 44 or 45 . . . single action gun and cocked and some whisky." On cross-examination by the plaintiff's attorney, of Mr. Le Boeuf, the kidnaped officer, this colloquy occurred, "Q. Were you . . . covered *with a rifle* all the way there? A. Yes, sir. . . . One of the fellows wanted to '*give it to me*' a couple of times." It is immaterial whether the kidnapers were possessed of a rifle or a revolver. The importance of this evidence is to show that the sheriff had reason to believe he

was in pursuit of desperate criminals. Very likely the wreck of the automobile is all that saved the kidnaped officer from being shot.

It may be true that the uniformed highway officers were not in sight of the plaintiff at the time he was handcuffed. We have therefore modified the opinion to state that they were merely present. But the plaintiff did admit seeing the entire group coming through the gate. The only point is that as a reasonable man he should have recognized the group as peace officers and he should have surrendered without disappearing in the cabin. His conduct tended to confirm the officers in their belief that he was one of the kidnapers. In support of the statement that the highway officers were present, Mr. Couch testified he was present near the sheriff when Mr. Allen came out of the cabin and was handcuffed. He said he was dressed "in the state uniform,—the state traffic officer's uniform. . . . I had everything on except the coat we wear in hot weather. Q. Did you have your badge on? A. Yes sir. Q. Did you approach the cabin with the other officers? A. We did. Q. Did you see the sheriff at the time he approached the cabin? A. Yes sir. . . . Q. Did you see the plaintiff Allen there? A. Yes sir. . . . He was to the right of me."

It does appear that Sheriff Toland of Butte County and his deputies were not with Sheriff McCoy when the arrest was made. That was an inadvertence which has been corrected. It is, however, of little importance.

Finally the petitioner challenges the statement that he shook hands good-naturedly with the sheriff and told him he was not harmed. Mr. McCoy testified in that regard, "The last word he said was 'Sheriff don't worry, I'm all right,' and he shook hands with me and bid me good bye." This seems like an assurance of goodwill. But it is insisted we should not accept the statement of defendant McCoy in that regard. The plaintiff was not called to rebut this statement. Moreover, Mr. Kennedy of the state forestry department, and Mr. Curran, deputy sheriff of Butte County, testified to facts which tend to impeach and challenge the good faith of the plaintiff in prosecuting this action. They both said that he afterwards declared in the sheriff's office at Marysville, "*I am not hurt* but will bring an action to see what I can get." Although he at first declared he had

been hit by a stray shot, several witnesses testified they examined him and his shirt at the place where he claimed to have been hit, and that there was no evidence of the presence of an injury on his person, and no hole penetrating the shirt.

We are satisfied the opinion as modified contains a fair and accurate statement of the facts of the case. ▮ The record is convincing of the fact that the sheriff in good faith, with reasonable cause to believe that he was arresting a member of the kidnaping gang of criminals, placed handcuffs upon the plaintiff, where they remained for only a few moments and were then removed with an apology. The record does not support the judgment. To permit a judgment to stand under such circumstances would result in a miscarriage of justice and would discourage peace officers from performing their duty.

The petition for a rehearing is therefore denied.