[S. F. No. 16768. In Bank. May 18, 1943.]

LOLA MAE FERNELIUS a Minor, etc. et al., Appellants, v. AUGUST PIERCE et al., Defendants; BODIE A. WALLMAN et al., Respondents.

Johnson & Harmon, W. G. Harmon, Heber James Brown and Wm. H. Henderson for Appellants.

F. Bert Fernhoff, City Attorney, John W. Collier, Assistant City Attorney, Hagar, Crosby & Crosby, Peter J. Crosby, Jr., and Thomas E. Davis for Respondents.

SCHAUER, J.—This case squarely presents the question as to whether public officials are liable in damages for injuries proximately resulting from their negligent failure to suspend or discharge known unfit and vicious subordinates, the officials having notice of the subordinates' unfitness and viciousness and having the power to suspend and remove them subject, however, to review by a civil service board. We conclude that the power to suspend or discharge the subordinates from duty and to start proceedings for their removal from civil service lists carries with it the correlative duty to vigilantly exercise the power, and that the negligent failure of such officials to act leaves them answerable in damages to persons who have suffered loss proximately resulting from such negligence.

This is an appeal by plaintiffs from a judgment in favor of certain defendants entered upon an order sustaining their demurrers to the complaint without leave to amend. All factual matters related herein are taken from the complaint, and by the demurrers and for the purposes thereof are confessed by the defendants to be true.

Plaintiffs Lola Mae Fernelius, Ardella Fernelius, Donald Fernelius and Ralph Fernelius are the infant children, and Mable Fernelius is the widow, of Fred Fernelius, deceased. The latter, while he was a prisoner in the Oakland City Jail, was so viciously and bestially assaulted and beaten by certain Oakland city police officers (defendants August Pierce and Glen Hancock) as to cause his death on the following day.

### The Pleading

No question is raised as to the sufficiency of the pleading

against the killers themselves, but it also seeks to state a cause of action against their superior officers, John F. Hassler and Bodie Wallman, who at all times concerned were, respectively, the city manager and the chief of police of the city of Oakland, and against their bondsman. The manager, the chief of police and the bondsman challenge its sufficiency. Pertinent to their responsibility in the premises the complaint alleges:

*As to City Manager Hassler:* That "as said city manager he was and is responsible for the proper and efficient administration of all the affairs of the city, and, subject to the civil service provisions, had at all times herein mentioned the power to appoint, discipline and remove all directors or heads of departments, all the chief officials and all subordinate officers and employees of the city responsible to him; that defendants August Pierce and Glen Hancock as police officers of the City of Oakland were responsible to him, the said city manager; that as the city manager said defendant John F. Hassler had at all times herein mentioned the power, subject only to the civil service provisions as aforesaid, to remove all police officers, and specifically defendants August Pierce and Glen Hancock, at any time he found them unfit or incompetent to perform their duties as police officers of the City of Oakland, or for misconduct or incompetency in the performance of their duties. That the civil service provisions to which the power of defendant John F. Hassler as said city manager was and is subject to as aforesaid, provide that all persons holding positions in the classified civil service shall be subject to suspension, fine and also to removal from office or employment, by order of the city manager, for misconduct, incompetence or failure to perform their duties, subject, however, to an appeal by the aggrieved party to the Civil Service Board within five days from the making of the order. That plaintiffs are informed and believe and on such information and belief allege the fact to be, that defendants August Pierce and Glen Hancock as police officers of the City of Oakland held at the times herein mentioned positions in the classified civil service of said City of Oakland.''

*As to Chief of Police Wallman:* That "as chief of police of the City of Oakland . . . [he] was at the times herein mentioned the chief executive of the police department of the said city, responsible for the execution of all laws, orders, rules and regulations of said department; that plaintiffs are

informed and believe and upon such information and belief allege the fact to be that said defendant Bodie Wallman as chief of police of said City of Oakland had at all times herein mentioned the power and duty to appoint, discipline and remove defendants August Pierce and Glen Hancock for misconduct, unfitness and incompetence as police officers of said City of Oakland as aforesaid, subject in like manner to the civil service provisions that the power of defendant John F. Hassler is subject to as alleged. . . .''

*As to the Incompetence and Unfitness of the Subordinate Officers and Notice Thereof to the Superior Officials:* ''That defendants August Pierce and Glen Hancock were unfit and incompetent to perform their duties as police officers of the City of Oakland as follows, to wit: that said August Pierce and Glen Hancock were vicious, high tempered, and addicted to the use of unnecessary force and violence and likely to unlawfully assault, beat, wound, ill-treat and use unnecessary force and violence against any person in their charge as police officers of the said City of Oakland. That defendants Bodie Wallman and John F. Hassler prior to May 4, 1940, knew, or should have known in the exercise of due care, of the aforesaid incompetence and unfitness of defendant August Pierce and defendant Glen Hancock to perform their duties as police officers of the City of Oakland; that on the following occasions defendant August Pierce did unlawfully assault, beat, wound and abuse the following persons, who were in his charge as a police officer of the City of Oakland, in the following manner, to wit: that on or about December 24, 1939, said defendant August Pierce sheared off the finger of one Jose August by shutting a jail door on the same; that on or about February 4, 1939, said defendant beat and wounded one Kenneth Warner; that on or about August 9, 1938, said defendant August Pierce and defendant Glen Hancock beat with a stick or club one Edison Shumate so severely that it was necessary that he be sent to a hospital for treatment; that on or about December 13, 1937, said defendant August Pierce struck one Orval Rodgers with such force that his jaw was broken and that said defendant left him in his cell the said night of said December 13, 1937, without medical treatment of any kind; that on or about November 1, 1939, said defendant August Pierce beat and clubbed on the head one Howard Lyon; that on or about May 1, 1938, said defendant August Pierce beat and abused one Dee Otis Roberts; that on or about August 6, 1938, said defendant August

Pierce beat and abused one Chuck Spencer; that on or about September 9, 1936, said defendant August Pierce struck one Marion P. Hughes in the face and stomach, knocking him against a wall. Plaintiffs are informed and believe and upon such information and belief allege the fact to be that the aforesaid beatings, woundings and abuses were reported to defendants Bodie Wallman and John F. Hassler who knew or should have known the same; that said reports were made and said knowledge obtained before the aforesaid unlawful assault, beating and wounding of Fred Fernelius by August Pierce and Glen Hancock as aforesaid, which resulted in the death of the said Fred Fernelius as aforesaid; that plaintiffs do not know in what manner said reports were made or the exact dates the same were made, that these facts are within the peculiar knowledge of the defendants August Pierce, Glen Hancock, Bodie Wallman and John F. Hassler. That in spite of the fact that said defendants Bodie Wallman and John F. Hassler knew or should have known prior to May 4, 1940, that the defendants August Pierce and Glen Hancock were unfit and incompetent as aforesaid, they wholly failed and neglected to suspend, discipline or discharge said August Pierce and Glen Hancock, they having the power and the duty so to do as set out in paragraphs V and VI hereof, and thereby failed and neglected to well, truly, honestly and faithfully perform the duties of their respective offices.''

*As to Presentation of Claim:* The complaint further alleges the timely presentation of a claim by all plaintiffs, for the wrongful death of the deceased, to the clerk of the City of Oakland, and to defendants Pierce, Hancock, Hassler and Wallman, and the rejection thereof by all defendants.

*As to the Bondsman:* Allegations of the complaint pertinent exclusively to the bondsman are discussed later in this opinion.

### Statutory Law Governing Treatment of Prisoners

Section 681 of the Penal Code of California provides that ''It shall be unlawful to use in the reformatories, institutions, jails, State hospitals or any other State, county, or city institution any cruel, corporal or unusual punishment or to inflict any treatment or allow any lack of care whatever which would injure or impair the health of the prisoner, inmate, or person confined . . . Any person who violates the provisions of this section . . . shall be guilty of a misdemeanor.''

232

232

## Pertinent Charter Provisions

The Charter of the City of Oakland provides (Stats. 1931, p. 2653) that the city manager, generally (subject to civil service provisions of the Charter), "shall have the power to appoint, discipline and remove all directors or heads of departments, all the chief officials, and all subordinate officers and employees of the City responsible to him; but the Manager may, by means of written rules and subject . . . to the civil service provisions when applicable, authorize the head of a department or office responsible to him to appoint, discipline and remove subordinates in such department or office." The charter further provides that (Stats. 1931, p. 2654) "The City Manager shall have the power, and it shall be his duty: . . . b. To act as the chief conservator of the peace within the City and to see that all laws and ordinances of the Council are duly enforced; . . . c. Except as otherwise in this Charter provided, to supervise the administration of the affairs of the City."

The civil service provisions of the charter declare that (Stats. 1931, p. 2665), "All persons holding positions in the classified civil service shall be subject to suspension, fine and also to removal from office or employment, by the City Manager . . . for misconduct, incompetency or failure to perform their duties . . . but subject to the appeal of the aggrieved party to the Civil Service Board . . . Any chief official . . . may temporarily suspend any subordinate then under his direction for incompetency, neglect of duty or disobedience of orders, but shall within twenty-four hours thereafter report the facts in writing to the City Manager . . . The City Manager . . . shall . . . if demanded by the subordinate suspended, hear evidence for and against him, and shall thereupon affirm or revoke such suspension, according as he . . . finds the facts to warrant." There is also a provision (Stats. 1931, p. 2665) for appeal by a disciplined or removed civil service employee, within five days from the making of the order, to the Civil Service Board "which shall fully hear and determine the matter" and whose "finding and decision . . . shall . . . be enforced and followed."

Likewise by the charter it is enacted that (Stats. 1931, p. 2665), "The Chief of Police shall be the chief executive officer of the [Police] Department and shall be held responsible for the execution of all laws and ordinances. . . . "

*Plaintiffs' Theory of the Case and Its Differentiation from the Doctrine of Respondeat Superior*

In the ensuing discussion, except as otherwise indicated, we refer to the respondents-defendants Hassler and Wallman (the city manager and the chief of police) as the defendants. Both plaintiffs and defendants unite in stating that plaintiffs' case is not laid on the doctrine of *respondeat superior.* Nevertheless, much of the argument and most of the authorities cited to us deal with that doctrine because under it, and in the cases dealing with it, defendants find principles of law which they claim exculpate them from responsibility, and plaintiffs, in seeking to develop and delineate the theory they espouse, must deal with those principles and differentiate some of them in steering their course to the end of holding defendants liable in the premises. It is unnecessary for us to assert academically whether plaintiffs' cause of action relates at all to that doctrine or is wholly independent of it. However, a clear distinction between plaintiffs' theory and the typical one of *respondeat superior* is necessary at the outset.

Under the rule of *respondeat superior,* as ordinarily understood, the master is held liable for the torts of his servants committed within the course of their employment. In the typical case the neglect is only that of the servant; the master is himself without fault. But because the servant is engaged in the master's work and is doing it in place of, or for, the master, the act of the servant is regarded as the act of the master. Responsibility devolves *up* through the relationship to the master and the question of proximate cause of the injury relates only to the act (or neglect) of the servant. In the case now presented by plaintiffs, however, we have a basically different factual pattern. The *neglect* charged here was not that of the subordinate officers; they did what was reasonably to be expected of them in view of their known propensities. The *neglect* that is pleaded is that of the defendants themselves. The legal fault charged here as the ground of liability is directly and personally that of the superior officers (the defendants). Responsibility is not claimed to devolve up to them merely derivatively through a relationship of master and servant or principal and agent. The fact that the killer-officers were employees subordinate to the defendants is essentially material here, not for the purpose of tracing responsibility for their acts up to defen-

dants through the ordinary principles of agency but rather as showing that the homicidal officers were in effect an *instrumentality under the control of the defendants* in the handling of which the defendants were given and charged with responsibility and power, and the question of proximate cause of the injury relates directly to the neglect of the defendants. This theory would not operate to permit recovery from superior officers in an action against them for the tortious acts or omissions of their subordinates where the superior officers themselves were not at fault in a manner proximately connected with the injury.

That as a general rule it is negligent to use an incompetent or unfit instrumentality there can be no question. The American Law Institute in its Restatement of the Law of Torts (vol. II, Negligence (1934), sec. 307, p. 833) states the rule as to responsibility for use of an incompetent instrumentality as follows: ''It is negligence to use an instrumentality, whether a human being or thing, which the actor knows or should know to be so incompetent, inappropriate, or defective, that its use involves an unreasonable risk of harm to others.'' By way of illustration the Institute states this case (at p. 834): ''A, the proprietor of an apartment house, employs a janitor, B, a man whom A knows to be of an exceedingly fiery and violent temper. C, one of A's tenants, complains to B in regard to lack of heat. B becomes violently angry and attacks and harms C. Irrespective of whether B's act is within the course of his employment as janitor, A is liable to C.''

### Defendants' Contentions

Defendants contend in effect that a principle (hereinafter stated) enunciated in *respondeat superior* cases dealing with claims against public officials for the acts or neglects of subordinates is controlling here, that such principle precludes recovery under that doctrine, and that if plaintiffs cannot recover on the *respondeat superior* theory they are wholly without remedy as against the superior officers.

### ˙ Law Points

The principle so enunciated is stated as an exception to the *respondeat superior* rule. It is the proposition that superior public officers generally are not liable for the torts of their subordinates where such subordinates are likewise

public employees. Such exception to the rule is, however, generally stated with one or more exceptions to its own operation. In 21 California Jurisprudence, section 17, at page 405, the statement is: "Pursuant to settled rules, a public officer is not responsible for the acts or omissions of police officers employed by or under him, if such subordinates are not in his private service, but are themselves servants of the government, unless such officer has directed the acts to be done or has personally co-operated therein, or unless, having the power of appointment, he has failed to use ordinary care in the selection."

Likewise in *Michel* v. *Smith* (1922), 188 Cal. 199 [205 P. 115], asserted by both plaintiffs and defendants to be the leading case on the subject in this state, the rule is stated in varying language. At page 201, it is declared as follows: "There is a well-defined exception to the general rule which renders one responsible in a civil action for the tortious acts of those employed by or under him. A public officer is not responsible for the acts or omissions of subordinates properly employed by or under him, if such subordinates are not in his private service, but are themselves servants of the government, unless he has directed such acts to be done or has personally co-operated therein." Again, at page 202 (of 188 Cal.) it is stated, "He [a chief of police] may even be charged with the duty of selecting the members of the force, but he is not responsible for their acts, unless he has directed such acts to be done, or has personally co-operated in the offense, for each policeman is, like himself, a public servant." These "exceptions"—personal direction of, or cooperation in, the offense—obviously are personal faults of the superior. So also is failure to use ordinary care in the employment or discharge of a subordinate. Mr. Floyd R. Mechem in his book entitled "Public Offices and Officers" (1890, Callaghan and Company) lists more "exceptions" of the same character. He states the general rule and then says (sec. 790, p. 529): "But this general rule is subject to certain exceptions, important to be borne in mind and as well settled as the rule itself. Thus the superior officer will be liable, (1) where, being charged with the duty of employing or retaining his subordinates, he negligently or wilfully employs or retains unfit or improper persons; . . . or (3) where he so carelessly or negligently oversees, conducts or carries on the business of

his office as to furnish the opportunity for the default; or (4) and *a fortiori,* where he has directed, authorized or co-operated in the wrong." Where the superior officer has the power and duty of removal of a subordinate, no logical reason appears why his responsibility for failure to discharge a known unfit subordinate should be any less than for initially employing such a person. The doctrine of responsibility of public officers for negligence in the appointment of a subagent was recognized in the case of *Baisley* v. *Henry* (1921), 55 Cal.App. 760, 763 [204 P. 399]. The court said: "The rule is that an agent is not in general liable to third persons for the misfeasance or malfeasance of a subagent employed by him in the service of his principal, unless he is guilty of negligence in the appointment of such subagent or improperly co-operates in the latter's acts or omissions. (2 C.J. 829.) An application of this principle is found in the rule, uniformly recognized, that a public officer is not personally liable for the negligence of an inferior officer, unless he, having the power of appointment, has failed to use ordinary care in the selection."

We find no authority, case or text, in which a public officer is said to be exculpated from liability in a case such as that here pleaded. In stating the general rule of nonliability of public officers for the torts of their subordinates, case and text authors usually have been vigilant in their care not to imply immunization for such a case. Thus in the annotation in 12 American Law Reports, Annotated, at page 980, the language is: "According to both the early and the more recent cases it is well settled as a general rule, subject, however, to a number of exceptions, that *in the absence* of a statute imposing liability, or *of negligence on his part in* appointing or *supervising his assistants,* neither an officer nor his bondsman is liable for the defaults and misfeasances of assistants appointed by him, provided that the assistants . . . become . . . officers themselves, or servants of the public." (Italics added.) Again, Shearman and Redfield in their text on Negligence (Baker, Voorhis & Co., Inc., 1941, revised ed., vol. 2, sec. 330, p. 805) state, "All public officers who have the power of appointing their subordinates are bound to exercise ordinary

care in selecting proper persons for the position, and to superintend their conduct; and they are bound not to assign to them tasks for which they know such subordinates to be incompetent, and in the execution of which it is reasonable to infer that disastrous consequences will ensue.''

In American Jurisprudence (43 Am.Jur., sec. 281, pp. 94, 95) the rule is stated in language almost identical with that quoted herein from the annotation in American Law Reports, Annotated, and it is further declared: ''And where an officer fails in a duty to take action, liability may be predicated on nonaction after knowledge of the negligence of subordinates has come to his attention.'' In *Strickfaden* v. *Greencreek Highway Dist.* (1926), 42 Idaho 738, 763 [248 P. 456, 49 A.L.R. 1057, 1071], the court said: ''The rule of *respondeat superior* does not apply where public officers are sought to be bound by the negligence of subordinate officers or employees, unless there has been a failure to exercise due care in the selection of such subordinates, or the officers have knowledge of the negligent acts of the inferior officers.'' To the same effect is *Doeg* v. *Cook* (1899), 126 Cal. 213 [58 P. 707, 77 Am.St.Rep. 171], and the rule is impliedly recognized by this court in *Hilton* v. *Oliver* (1928), 204 Cal. 535 [269 P. 425, 61 A.L.R. 297], wherein Mr. Justice Shenk, speaking for the court, scrupulously avoids a contrary implication in disposing of a case wherein there was evidence of negligence by employees but not by the superiors. The opinion specifically points out (p. 539) that ''there was no evidence whatever in the record, either directly or by reasonable inference, that the defendant trustees knew anything at all about such [the negligent] action on the part of said employees in doing the work,'' and then (p. 540) holds: ''As the record herein does not disclose that the defendant trustees directed or cooperated in or knew of the alleged acts of negligence on the part of the subordinate agents and employees of the district or were at all remiss in the matter of their appointment, the evidence was wholly insufficient to support the verdict.'' In the same case this court also recognized the distinction between the doctrine of *respondeat superior* and the theory of direct, personal negligence which plaintiffs invoke in the case at bar. The court in distinguishing the cases of *Perkins* v. *Blauth* (1912), 163 Cal. 782 [127 P. 50], and *Proper* v. *Sutter Drainage Dist.* (1921), 53 Cal.App. 576 [200 P. 664],

from the case then under consideration says (204 Cal. at p. 540): "In neither case was the doctrine of *respondeat superior* applied or applicable, for negligence *was brought home to the trustees themselves.*" (Italics added.)

The case of *Hale* v. *Johnston* (1918), 140 Tenn. 182 [203 S.W. 949], an action against county commissioners and others to recover damages for beatings resulting in the death of a prisoner, presents a factual and legal situation pertinently similar to the case before us. There was there, as there is here (Pen. Code, sec. 681), a statute prohibiting corporal punishment of prisoners. The Supreme Court of Tennessee said (p. 192 of 140 Tenn., p. 951 of 203 S.W.): "The negligence averred against the defendant commissioners is: (1) That a custom of brutally beating and maltreating prisoners by the foreman and guards obtained at the county workhouse as a part of its discipline for many years; (2) defendants knew, or by the exercise of ordinary care could have known, of this cruel and inhuman custom, and of consequence knew, or could have known, of the killing of deceased; and (3) so knowing, in fact or in law, they took no steps to prevent the death of deceased. . . . "

"[P. 200 of 140 Tenn., p. 953 of 203 S.W.] From what has been said, it naturally follows that the failure of defendants to discharge their duties in the premises was the proximate cause of the punishment inflicted upon deceased. If they had been diligent to see that corporal punishment was not practiced as a part of the discipline of the workhouse, it is apparent that deceased would not have been killed in the manner in which he was. This is different from the case of an outbreak of temper upon the part of a guard, followed by a blow which takes the life of an inmate. For this we apprehend defendants would not be liable. But the case made by plaintiff, both in the declaration and in the proof, is that corporal punishment was a part of the system of discipline of the workhouse, and was constantly practiced in the most brutal ways for many years, and that defendants knew, or by the exercise of ordinary care could have known, of its existence."

In *Michel* v. *Smith* (1922), *supra,* 188 Cal. 199 [205 P. 115], this court was dealing only with the general rule of nonresponsibility of public officers for the acts or omissions of their subordinates. It had no occasion to consider, formulate, or express any such exception to the rule as that

which is now suggested. Indeed, the statement of the exceptions noted in the rule as there declared was but incidental to the application of the general rule. The court held that under the charter of the city of Los Angeles the police chief and a sergeant of police, who gave no specific or even general directions concerning the arrest of the plaintiff, would not be liable for his unlawful arrest by subordinate officers (his arrest actually was held not unlawful). There was no contention, however, in that case that the chief of police and the sergeant knew that the arresting officers intended to make an unlawful arrest and, having that knowledge and the power and duty to prevent the unlawful act, that they negligently stood by and permitted it to take place. The court obviously did not make any pronouncement upon any such factual situation as that last depicted. It (the last depicted situation) is more nearly the one that is now before us.

We are of the opinion that permitting an act, where one has knowledge that it is impending and has the power and duty to prevent it, is the equivalent of directing it, so far as legal responsibility therefor is concerned.

Defendants contend that they should not be held accountable for failing to suspend or remove the known incompetent and unfit officers because such officers had a right of appeal to the civil service board and such board had the ultimate power to affirm or overrule their orders. They urge, in other words, that they should not be held responsible unless they had the *wholly unrestricted* power to employ and discharge subordinates. In support of this thesis they cite *Union Bank & Trust Co.* v. *Los Angeles County* (1938), 11 Cal.2d 675, 679 [81 P.2d 919], wherein it is stated that "It may be conceded that in the absence of statute the modern view is opposed to making public officers civilly liable for torts of deputies, where the latter are themselves statutory officers and not under the superior's unrestricted control or right of hiring and discharging." Careful reading of the quotation itself discloses that it is not pertinent to the case before us. This court there was dealing with the question of holding a superior officer liable for the tort of a deputy purely under the doctrine of *respondeat superior* where no personal neglect of the superior, proximately causing the loss, was alleged. There is no implication that the ruling was intended to apply in a case where the superior

officer had himself been negligent. Indeed the opinion recites (p. 678) that "the county clerk did not himself commit any wrongful act." That case was an action against a county clerk to recover money which had been embezzled by a deputy. It was not pleaded or contended that the deputy had theretofore repeatedly embezzled money entrusted to him and that his superior officer knew that he had repeatedly embezzled money and in all probability would do so again if given the opportunity, and that with such knowledge the superior, having the exclusive power and duty to discharge him, subject only to review by a civil service board, negligently or wilfully retained him in a position where he would have the opportunity to indulge his kleptic propensity. Had those things recited as not pleaded been pleaded, we entertain no doubt that a contrary conclusion would have been reached in that case. Their equivalents are alleged in the case now before us.

The several other cases cited by defendants enunciating in varying language the proposition stated in the Union Bank & Trust Co. case (*supra,* 11 Cal.2d 675) are all equally subject to differentiation from the case we are considering. In *Van Vorce* v. *Thomas* (1937), 18 Cal.App.2d 723, 726 [64 P.2d 772], the District Court of Appeal recited typical facts as to the personnel organization of a large office, but containing no implication of negligence on the part of the head of the office, and declared, "Under such circumstances, to make the head of the office respond in damages for the negligent discharge of duties, which he has no choice but to delegate to others, becomes 'manifestly unjust.' " But certainly it is not "manifestly unjust" to hold a superior officer to reasonable diligence in the discharge of his own duties.

It is a reasonable inference that the consequences flowing from the neglect of the defendants were to be apprehended by them as likely to result therefrom. A trier of the fact might well conclude that the warning implicit in the pleaded conduct of police officers Pierce and Hancock was more shockingly imperative in its demands for affirmative action than words could be. One could perhaps doubt that a human being, though he avowed his intent in words, would at the test be depraved enough to carry into execution the conduct alleged. But if it were known, as averred here, that there were persons who actually possessed and indulged such propensities, the deliberate toleration of such

persons on a police force by those having such knowledge and the power and duty to remove them appears to be without legal justification. It is a specious argument which would immunize any officer or employee for neglect to perform his own clear duty merely because potentially his *proper* act *could* be rendered nugatory by the *improper* act of a board or officer having a higher authority. Particularly is this true where, as here, the power and duty to initiate the basic and effective action *are vested exclusively in the officers sought to be charged.* In the Charter of the City of Oakland no provision has been called to our attention under which the unfit officers could have been removed except by action of these defendants, and it has not been suggested that any officers other than defendants owed any duty or had the power to remove them.

The law giving to a superior officer the power to suspend or remove subordinates would be little more than a contribution to the ego of the superior if it did not likewise place on him the correlative duty of vigilantly exercising that power in the protection of the public interest. Against bestiality and brutality by police officers of the type depicted in this case the public has no adequate protection unless the superiors are answerable for any lack of vigilance in the discharge of their duty. There is no more reason for excusing negligent failure to perform a *restricted duty,* if such duty faithfully performed would, in the ordinary course of events, *be adequate to prevent the damage,* than there is for excusing such failure to perform an unrestricted duty.

The argument that the city manager might have overruled the chief of police if he had acted to suspend the unfit officers, or that the Civil Service Board might have restored them to duty after discharge by the city manager, is but speculation based on an unsound premise—the premise that the manager or board is presumed to act improperly after previous proper action by the party primarily charged with the duty. No such presumption can be indulged. It follows that a cause of action is stated as against defendants Hassler and Wallman.

### Liability of the Bondsman

The complaint further alleges the execution of a bond by the defendant Fidelity and Deposit Company of Maryland by the terms of which it undertook, in the sum of

$50,000 as to defendant Hassler and $5,000 as to defendant Wallman, "to indemnify and hold harmless the City of Oakland . . . and/or its officers . . . as their respective interests may appear against any loss occasioned by the failure on the part of any officer and/or employee listed in the schedule hereto attached and made a part hereof . . . to well, truly, honestly and faithfully perform all of the duties that are now or may hereafter be required of them and/or either of them by any law of the State of California and/or any ordinance of the City of Oakland and/or required by the City Manager or other chief official or departmental head. . . ."

Defendant surety company adopted the argument of the defendants Hassler and Wallman that they were not responsible in the premises and in addition contends that it is not liable to plaintiffs for defendants' default because of the form and substance of the instrument executed and the law governing its conditions. Such contention is not tenable.

In presenting its position the defendant surety company emphasizes that the instrument executed by it states an agreement "to indemnify and hold harmless *the City of Oakland* . . . and/or its officers and/or councilmen" (italics added) against loss but does not purport to run in favor of any other obligee. However, section 961 of the Political Code provides that "Every official bond, given pursuant to law, executed by any officer of the state, or of any county or any subdivision thereof, or of any town or city organized under the provisions of this code, *or by any officer of a city* or county *governed by a freeholders' charter, is in force and obligatory upon the principal and sureties* therein to and for the state of California, or such municipal corporation, and *to and for the use and benefit of all persons who may be injured or aggrieved* by the wrongful act or default of such officer in his official capacity; and *any person so injured or aggrieved may bring suit on such bond, in his own name,* without an assignment thereof." (Italics added.) That section, salutary in its public benefit, was in force at the time the instrument in question was executed and, if applicable at all, must be deemed a part of the contract the same as though its terms had been written therein. (*Brown* v. *Ferdon* (1936), 5 Cal.2d 226, 230 [54 P.2d 712]; *Hales* v. *Snowden* (1937), 19 Cal.App.2d 366, 369 [65 P.2d 847]; *Mueller* v. *Elba Oil Co.* (1942), 21 Cal.2d

188, 204 [130 P.2d 961].) If the quoted section (Pol. Code, § 961) is applicable, plaintiffs are entitled to sue on the bond.

Defendant surety company says that the section is not applicable because the bonding of city officers is a municipal affair and the Oakland City Charter provides for a bond conditioned in favor of the city but not in favor of its citizens. It relies upon *Sunter* v. *Fraser* (1924), 194 Cal. 337 [228 P. 660], and *Municipal Bond Co.* v. *City of Riverside* (1934), 138 Cal.App. 267 [32 P.2d 661]. The first cited case (*Sunter* v. *Fraser*) contains the statement (at p. 340), "appellants point out that section 961 is a part of article 9, which covers the subject of official bonds to be given by state, county and township officers only (*Rowe* v. *Rose*, 26 Cal.App. 744, 745 [148 P. 535])." Obviously an error crept into that statement. *Rowe* v. *Rose* (1915), 26 Cal.App. 744 [148 P. 535], cited as authority, merely mentions (at p. 745) that "under section 950 of the Political Code, the official bonds *required to be filed with the county clerk* are those of 'county and township officers.'" (Italics added.) Article 9 of chapter 7, title 1, part 3, of the Political Code covers bonds of public officers generally, city as well as state, county and township (see Pol. Code, §§ 955, 961).

In the case of *Municipal Bond Co.* v. *City of Riverside* (1934), *supra,* 138 Cal.App. 267 [32 P.2d 661] the District Court of Appeal held that under the wording of the charter there involved the city had "expressly declared its independence from the control of general laws as to municipal affairs" (138 Cal.App. at p. 278) and that section 961 of the Political Code did not operate to give a right of suit maintenance to any person other than the obligee named. In that case, however, according to the opinion (138 Cal.App. at p. 276), the charter declared in the city the power "To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided *in this charter.*" (Italics added.) That charter also declared (see p. 277 of the opinion) that "The form and conditions of all official bonds, the affidavits and justification thereon shall be as is required by the general laws of the state in force at the time such bonds are given." The District Court of Appeal held that (138 Cal.App., at p. 277) "the conferring of a right of action upon one other than the obligee designated in the bond has no bearing upon the form of the bond" and

that "Nor do we think that the giving of a right of action may properly be denominated a condition of the bond."

The provisions of the Oakland City Charter are, however, definitely different from those the District Court of Appeal dealt with in the case cited. Whereas the Riverside Charter asserted the right "to make and enforce all laws . . . in respect to municipal affairs, subject only to the restrictions and limitations *provided in this charter,*" (italics added) the Oakland Charter declares (Stats. 1911, vol. 2, p. 1552), "The city of Oakland shall have, exercise and enjoy all the rights, immunities, powers, benefits, privileges and franchises now possessed, enjoyed, owned or held by it; and shall be subject to all the duties and obligations now pertaining to or incumbent on said city as a corporation, *not inconsistent with the provisions of this charter.*" (Italics added.) Specifically, as to official bonds the charter provides (Stats. 1931, pp. 2649-2650) that "The Mayor, Auditor, Treasurer, each Councilman and each School Director shall, before entering upon the duties of his office, each give and execute to the City a bond as hereinafter provided. . . . The bond of the Mayor and of each Councilman shall each be in the penal sum of Ten Thousand Dollars. . . . The amount of the bond required of the City Manager shall be fixed by the Council at not less than Fifty Thousand Dollars ($50,000). *Every bond shall contain the condition that the principal will well, truly, honestly and faithfully perform the duties of his office.* . . . All the provisions of the law of the State relating to official bonds of City officers, not inconsistent with this Charter, shall be complied with." (Italics added.)

There is nothing in the foregoing charter provisions which is inconsistent with the right of plaintiffs to sue under section 961 of the Political Code, and there is nothing in the last mentioned section which is inconsistent with the charter insofar, at least, as it applies to the official bond of the city manager and the chief of police. The requirement that the bond be given to the city is not inconsistent with the right of individual persons, aggrieved by a city officer's neglect, to sue thereon. But it is also noteworthy that *the city manager's bond is not* one of those which is specifically required to be executed "to the city." (And the same is true as to the bond of the chief of police.) Only the "Mayor, Auditor, Treasurer, each Councilman and each School Director" are listed as being required by the charter to "give and execute *to the City* a bond as hereinafter provided."

(Italics added.) The only specific charter reference to the bond of the city manager is that "The amount of the bond required of the City Manager shall be fixed by the Council at not less than Fifty Thousand Dollars ($50,000)." Furthermore, the provision that "*Every* bond shall contain the condition that the principal will well, truly, honestly and faithfully perform the duties of his office" (italics added) seemingly contemplates the execution of bonds in different forms with the requirement, however, that *all*, of whatever form, shall contain the specified condition. The above-quoted provisions, coupled with the declaration that "All the provisions of the law of the state relating to official bonds of City officers, not inconsistent with this Charter, shall be complied with," evidences the intent that the provisions of article 9 of chapter 7, title 1, part 3, of the Political Code shall be applicable and complied with, at least as to the city manager's (and the police chief's) bond.

As to the substance and form of the contract executed by the surety company here, it must be construed in the light not only of section 961 of the Political Code, above quoted, but also in view of the beneficent and remedial language in section 963 of the same code: "Whenever an official bond does not contain the substantial matter or conditions required by law, or there are any defects in the approval or filing thereof, it is not void so as to discharge such officer and his sureties; but they are equitably bound to the state or party interested; and the state or such party may, by action in any court of competent jurisdiction, suggest the defect in the bond, approval, or filing, and recover the proper and equitable demand or damages from such officer and the persons who intended to become and were included as sureties in such bond." As the provisions of law heretofore quoted must be deemed to constitute a part of the contract of the surety, the fact that the bond of the manager is not specifically payable to the State of California, as required by section 958 of the Political Code, does not constitute a defense. (*Hubert* v. *Mendheim* (1883), 64 Cal. 213, 218 [30 P. 633]; *Wood* v. *Lehne* (1938), 30 Cal.App.2d 222, 225 [85 P.2d 910].) If the bond were to be deemed defective in form the fact that a copy of it is attached to the complaint is a sufficient suggestion of such defect to meet the requirements of the statute. (*People* v. *Huson* (1889), 78 Cal. 154, 157 [20 P. 369].)

So far as liability on the bond of defendant Wallman is concerned, it is to be observed that the chief of police is not one of the officers specifically mentioned in the charter provision governing official bonds and the discussion of the subject in relation to the defendant Hassler is determinative of it in relation to defendant Wallman.

The judgment is reversed and the cause is remanded to the superior court with directions to overrule the demurrers of the defendants Bodie A. Wallman, John F. Hassler and Fidelity and Deposit Company of Maryland, a corporation.

Gibson, C. J., Curtis, J., Carter, J., and Traynor, J., concurred.

Edmonds, J., concurred in the judgment.

SHENK, J.—I concur in the judgment of reversal on the ground that the allegations of the complaint are sufficient to require the defendants Hassler and Wallman to answer, particularly the allegations of prior knowledge on their part of the vicious propensities of the malefactors, Pierce and Hancock, and of failure to institute timely disciplinary proceedings against them. These allegations, the truth of which is admitted for the purposes of the demurrer, bring the case fairly within the rules announced in *Michel* v. *Smith,* 188 Cal. 199 [205 P. 115], and similar cases. The civil service provisions of the Oakland City Charter are in essential respects the same as the provisions of the Los Angeles City Charter involved in the Michel case. A sound public policy supports the general rule of non-liability of superior public officers. for the torts of inferior civil service officers and employees and exceptions to that rule should not be extended; otherwise the assumption of public office with liability for the misdeeds of inferiors occupying civil service positions, many times numbering thousands, would indeed be a hazardous undertaking.

Respondents' petition for a rehearing was denied June 14, 1943.