[L. A. No. 19159. In Bank. Mar. 30, 1945.]

H. J. LELANDE, Petitioner, v. J. M. LOWERY, as County Auditor, etc., Respondent.

Rollin L. McNitt and Edythe Jacobs for Petitioner.

J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, and Jesse J. Frampton, Deputy County Counsel, for Respondent.

SCHAUER, J.—Petitioner is the assignee of the claim of F. C. Roueche, in the sum of $53.82, and the claim of the Hawthorne Advertising Press, Ltd., in the sum of $19.98, against the County of Los Angeles. Each claim is for moneys due under a contract with the county for publication of notices of sale of tax deeded real property. Each assignor is the owner of a newspaper of general circulation, authorized (at least insofar as the issues of this case are concerned) to publish such notices. Petitioner, as assignee, presented the claims to respondent, County Auditor of the County of Los Angeles. Respondent disallowed the claims. Petitioner then presented the claims to the Board of Supervisors of the County of Los Angeles, which approved and allowed them and ordered respondent to issue warrants thereon to petitioner. Respondent refused to comply with such order. Respondent's refusal to issue warrants on the claims is based on section 161 of the Revenue and Taxation Code (Stats. 1943, ch. 280, p. 1199). Such section provides: "Whenever any notice, delinquent list or other document required to be made under this code is to be published, the county shall contract directly with the newspaper in which publication is proposed to be made. Any contract so made or any moneys due thereunder shall not be assignable. The newspaper shall not pay, or contract to pay, to any person, firm or corporation, by way of commissions, any part of the moneys received from the county in payment of said publication."

Petitioner seeks mandate to compel issuance of warrants on the claims assigned to him. He argues that the statutory prohibition of assignment of moneys due under contracts for publication of tax notices (1) is beyond the police power of the

state in that it in no way relates to the public peace, health, safety, morals, general welfare, or convenience of the people of the State of California, (2) deprives him of property and restricts his liberty of contract without due process of law, and (3) denies to him the equal protection of the laws. To the petition for writ of mandate respondent demurs generally. We have concluded that the demurrer must be sustained.

According to the allegations of the petition the Board of Supervisors of Los Angeles County has adopted, as the most advantageous method of selling tax deeded properties (thus making possible collection of delinquent taxes thereon and return of such properties to the assessment rolls), the policy of advertising tax sales in local newspapers which circulate in the vicinities of the properties to be sold. Payment on advertising contracts of the county with such local newspapers is often delayed for periods of 90 to 120 days after publication of the notices. Therefore, the publishers of such newspapers frequently find it necessary or expedient, after completing publications under such contracts, to assign the moneys due thereunder as collateral security or at a discount. It is asserted (inherently a conclusion or opinion) that if publishers cannot assign such moneys they will not contract to publish tax notices. Thus, it is contended, by the prohibition of section 161 of the Revenue and Taxation Code against assignment of moneys due, the effectiveness of the program of the board of supervisors will be jeopardized, to the immeasurable loss of the people of the State of California and particularly the taxpayers of Los Angeles County, and petitioner will be prevented from lending moneys to publishers on the security of such contracts and from acquiring claims for moneys due thereunder.

The contracts between the county and petitioner's assignors were entered into subsequent to August 4, 1943, the effective date of section 161 of the Revenue and Taxation Code. Hence, the provisions of section 161, if the section is valid, entered into and formed a part of such contracts as fully as if the provisions were referred to or incorporated in their terms. (See e. g., *Welsh* v. *Cross* (1905), 146 Cal. 621, 624 [81 P. 229, 106 Am.St.Rep. 63, 2 Ann.Cas. 796]; *Hub Hdw. Co.* v. *Aetna Acc. etc. Co.* (1918), 178 Cal. 264, 267 [173 P. 81]; *Meriwether Invest. Co., Ltd.,* v. *Lampton* (1935), 4 Cal.2d 697, 703 [53 P.2d 147]; *Brown* v. *Ferdon*

(1936), 5 Cal.2d 226, 230 [54 P.2d 712] ; *Fernelius* v. *Pierce* (1943), 22 Cal.2d 226, 243 [138 P.2d 12] ; *Baugh* v. *Rogers* (1944), 24 Cal.2d 200, 215 [148 P.2d 633, 152 A.L.R. 1043].) The realities of this case warrant us in recognizing, however, that the moneys payable under the contracts, if they are not assignable, are thus because of the statutory provision and not because of volition of the parties to the contracts. Indeed, as above stated, the board of supervisors, despite the statute, ordered that respondent issue warrants to petitioner on the claims purported to be assigned. Unless the statute is invalid such order was void. (Pol. Code, § 4005.)

It cannot be doubted that the Legislature has the power, within constitutional limitations, to enact terms upon which the state (or counties, its political subdivisions) will contract to expend public moneys for public work. (See *City of Pasadena* v. *Charleville* (1932), 215 Cal. 384, 396 [10 P.2d 745] ; *Metropolitan Water Dist.* v. *Whitsett* (1932), 215 Cal. 400, 407 [10 P.2d 751].) "[I]t belongs to the State, as the guardian and trustee for its people, and having control of its affairs, to prescribe the conditions upon which it will permit public work to be done on its behalf, or on behalf of its municipalities. . . . Its action touching such a matter is final so long as it does not, by its regulations, infringe the personal rights of others." (*Atkin* v. *Kansas* (1903), 191 U.S. 207, 222-224 [24 S.Ct. 124, 48 L.Ed. 148] ; *Heim* v. *McCall* (1915), 239 U.S.175, 191 [36 S.Ct. 78, 60 L.Ed. 206, Ann. Cas. 1917B 287] ; see *Ellis* v. *United States* (1907), 206 U.S. 246, 255 [27 S.Ct. 600, 51 L.Ed. 1047] ; *Perkins* v. *Lukens Steel Co.* (1940), 310 U.S. 113, 127 [60 S.Ct. 869, 84 L.Ed. 1108].)

It may be confidently asserted that it is properly a function of state government to advertise its offering of tax deeded properties which it proposes to sell. The publication of tax notices contracted to be made by petitioner's assignors is "public work," not a private business enterprise. (*State* v. *Defiance County* (1894), 1 Ohio Dec. 584 [32 Ohio L.J. 88] ; *State ex rel. Woare* v. *Board of Commrs.* (1924), 70 Mont. 252, 275 [225 P. 389].)

Specifically as to petitioner's first contention—*that the prohibition of assignment is beyond the police power of the state and is therefore void*—it is to be observed that sec-

tion 161 of the Revenue and Taxation Code is not a police measure regulating the intercourse of private citizen with private citizen, and need not be justified as such. ■ That the state's power to prescribe the terms upon which public work shall be done does not depend upon its "police power" appears from a comparison (see three following paragraphs) of *Atkin* v. *Kansas* (1903), *supra,* 191 U.S. 207 [24 S.Ct. 124, 48 L.Ed. 148], with *Lochner* v. *New York* (1905), 198 U.S. 45 [25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133], and of *Heim* v. *McCall* (1915), *supra,* 239 U.S. 175 [36 S.Ct. 78, 60 L.Ed. 206, Ann.Cas. 1917B 287], with *Truax* v. *Raich* (1915), 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131, Ann.Cas. 1917B 283]. Implications to the contrary in *Ex parte Kuback* (1890), 85 Cal. 274, 276 [24 P. 737, 20 Am.St.Rep. 226, 9 L.R.A. 482], are disapproved.

In *Atkin* v. *Kansas* (1903), *supra,* the Supreme Court of the United States held constitutional an act which provided that "it shall be unlawful for" any person who contracts with the state or its political subdivisions to do public work "to require or permit any . . . person to work more than eight hours per calendar day in doing such work" and which made violation of the provisions of the act a criminal offense. The court noted (p. 218 of 191 U.S.) that "No question arises here as to the power of a State, consistently with the Federal Constitution, to make it a criminal offense for an employer in purely private work in which the public has no concern, to permit or require his employés to perform daily labor in excess of a prescribed number of hours," and stated (p. 222 of 191 U.S.) that "It may be that the State, in enacting the statute, intended to give its sanction to the view held by many, that, all things considered, the general welfare of the employés . . . will be subserved if labor performed for eight continuous hours was taken to be a full day's work. . . . We have no occasion here to consider these questions . . . for, whatever may have been the motives controlling the enactment of the statute in question, we can imagine no possible ground to dispute the power of the State to declare that no one undertaking work *for it or for one of its municipal agencies,* should permit or require an employé on such work to labor in excess of eight hours a day."

In *Lochner* v. *New York* (1905), *supra,* 198 U.S. 45, 57, 58 [25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133], the Supreme

Court of the United States held unconstitutional a statute which provided that no employe "shall be required or permitted" to work more than sixty hours a week in a bakery, on the ground that the statute involved "neither the safety, the morals nor the welfare of the public" and was not "necessary or appropriate as a health law to safeguard the public health or the health of the individuals who are following the trade of a baker." The court stated (p. 55 of 198 U.S.) :"Nor does *Atkin* v. *Kansas*, 191 U.S. 207 [24 S.Ct. 124, 48 L.Ed. 148], touch the case at bar. The Atkin case was decided upon the right of the State to control its municipal corporations and to prescribe the conditions upon which it will permit work of a public character to be done for a municipality." (See, also, *Adkins* v. *Children's Hospital* (1923), 261 U.S. 525, 547 [43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238]. We are, of course, not here concerned with the present status of the holdings of the Lochner and Adkins cases that the laws there considered were not a legitimate exercise of the police power.)

In *Truax* v. *Raich* (1915), *supra*, 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131, Ann.Cas. 1917B 283], a statute which provided that any employer of more than five persons "shall employ not less than eighty (80) per cent qualified electors or native-born citizens of the United States" was held unconstitutional. The court pointed out (p. 40 of 239 U.S.) that "the act is not limited to persons who are engaged on public work or receive the benefit of public moneys," and said (p. 41 of 239 U.S.) that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure. [Citations.] If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of laws would be a barren form of words." In *Heim* v. *McCall* (1915), *supra*, 239 U.S. 175 [36 S.Ct. 78, 60 L.Ed. 206, Ann.Cas. 1917B 287], decided during the same term as the Truax case, a statute which provided that "In the construction of public works . . . only citizens of the United States shall be employed" was held constitutional on the authority of *Atkin* v. *Kansas* (1903), *supra*. (See, also, *People* v. *Crane* (1915), 214 N.Y. 154, 160 [108 N.E. 427, Ann.Cas. 1915B 1254, 1256, L.R.A. 1916D 550], affmd., *Crane* v. *New York* (1915), 239 U.S. 195 [36 S.Ct. 85, 60 L.Ed. 218].)

In disposing of petitioner's second contention—*that the statute deprives him of property and restricts his liberty of contract without due process of law; i. e., arbitrarily*—it is not necessary for us to determine the existence or exact extent of limitations which, by virtue of the concept of due process, may circumscribe the power of the state to prescribe by statute the terms on which public work shall be done. Assuming for the purposes of this opinion that the general proposition that the state cannot arbitrarily deprive anyone of liberty or property might have application to a general law prescribing the terms upon which public work shall be done, it is a sufficient answer to point out that it is clear, for the reasons hereinafter set out, that section 161 of the Revenue and Taxation Code does not arbitrarily deprive anyone of liberty or property.

It is true that by section 161 those who contract with the county to publish tax notices and those who lend money to such publishers are, to the extent covered by such statute, prohibited from disposing of and acquiring property (choses in action); their freedom to contract with one another is to that extent limited; they are restrained in the pursuit of their respective occupations. But the very right freely to contract for which petitioner here contends is exercised by the state, rather than denied to petitioner or his assignors, by section 161. "It cannot be deemed a part of the liberty of any contractor that *he* be allowed to do public work in any mode he may choose to adopt, without regard to the wishes of the State." (*Atkin* v. *Kansas* (1903), *supra,* 191 U.S. 207, 222 [24 S.Ct. 124, 48 L.Ed. 148].)

The fact that section 161 in a limited sense and indirectly restricts the liberty of contract of petitioner, who is not engaged in public work, does not render it objectionable. "A statute does not become unconstitutional merely because it has created a condition of affairs which renders the making of a related contract, lawful in itself, ineffective." (*Bayside Fish Flour Co.* v. *Gentry* (1936), 297 U.S. 422, 427 [56 S.Ct. 513, 80 L.Ed. 772, 776].)

The Legislature of this state has declared, in effect, by the statute in question, that moneys due under certain contracts for public work shall be paid directly to the one who has agreed to do the work, not to his assignee. The prohibition against assignment is for the protection of the state and its political subdivisions, the counties. Among the natural and obvious purposes of such prohibition are protection of the

counties from harassment by multiplication of the number of persons with whom they must deal and from embroilment in conflicting claims, with resultant delay and the possibility of multiple liability, and prevention of fraud upon the public funds. (See *Hobbs* v. *McLean* (1886), 117 U.S. 567, 576 [6 S.Ct. 870, 29 L.Ed. 940]; *Freedman's Sav. & Tr. Co.* v. *Shepherd* (1888), 127 U.S. 494, 506 [8 S.Ct. 1250, 32 L.Ed. 163]; *Martin* v. *National Surety Co.* (1937), 300 U.S. 588, 594 [57 S.Ct. 531, 81 L.Ed. 822].) Such purposes are legitimate.

Petitioner argues that the Legislature should have adopted some other means of protection than absolute prohibition; that it might, for example, have provided for recordation of the assignment and its approval by the public contracting agency before such assignment could become effective; and that the statute is unreasonable because it does not provide any method by which contractors can obtain financial assistance. The means of promoting a public purpose by legislative action, however, are ordinarily for legislative determination. (*Allied Architects' Assn.* v. *Payne* (1928), 192 Cal. 431, 435 [221 P. 209, 30 A.L.R. 1029].) And we cannot agree with petitioner that absolute prohibition of voluntary assignment of a contract for public work, or of the moneys due thereunder, effects an unreasonable interference with private interests or that the Legislature, to protect such interests, should necessarily have devised a comparatively elaborate regulatory scheme instead of the simpler means of absolute prohibition. The statute does not preclude the publishers from borrowing or the petitioner from lending money under arrangements which do not call for an assignment of the contracts or of the moneys accruing thereon; it simply provides, as above indicated, a reasonable means tending to protect the county from involvement in arrangements between publishers and their creditors.

In regard to petitioner's third contention—*that the prohibition (by its limited application) denies him equal protection of the laws*—we are impelled to the conclusion that the Legislature, in limiting its enactment to contracts for publication of "any notice, delinquent list or other document required to be made under this code" (Rev. & Tax. Code, § 161) has not adopted a basis of classification which is unreasonable, arbitrary, or discriminatory within the meaning of constitutional guaranties.

■ A law is special within the prohibitions of the California Constitution (art. I, §§ 11, 21; art. IV, § 25) when it is not founded on a natural, intrinsic, or constitutional distinction which reasonably justifies difference in treatment. (*Ex parte Sohncke* (1905), 148 Cal. 262, 267 [82 P. 956, 113 Am.St.Rep. 236, 7 Ann.Cas. 475, 2 L.R.A.N.S. 813]; *Darcy* v. *Mayor of San Jose* (1894), 104 Cal. 642, 645 [38 P. 500]; *Rauer* v. *Williams* (1897), 118 Cal. 401, 408 [50 P. 691]; *Pacific Indemnity Co.* v. *Myers* (1931), 211 Cal. 635, 643-644 [296 P. 1084].) The Legislature can make reasonable classifications; i. e., classifications which have a substantial relation to a legitimate object to be accomplished. (*City of Pasadena* v. *Stimson* (1891), 91 Cal. 238, 251-252 [27 P. 604]; *Hollenbeck-Bush P. Mill Co.* v. *Amweg* (1917), 177 Cal. 159, 163 [170 P. 148]; *In re Sumida* (1918), 177 Cal. 388, 391 [170 P. 823]; *In re Kotta* (1921), 187 Cal. 27, 33 [200 P. 957]; *Martin* v. *Superior Court* (1924), 194 Cal. 93, 100 [227 P. 762]; *People* v. *Western Fruit Growers* (1943), 22 Cal.2d 494, 506 [140 P.2d 13].) A law is general and uniform and affords equal protection in its operation when it applies equally to all persons within such a classification. (*Superior Wheeler C. Corp.* v. *Superior Court* (1928), 203 Cal. 384, 388 [264 P. 488]; *Rainey* v. *Michel* (1936), 6 Cal.2d 259, 270-271 [57 P.2d 932, 105 A.L.R. 148], and cases there cited.)

"The legislature is not debarred from classifying according to general considerations and with regard to prevailing conditions; otherwise, there could be no legislative power to classify. . . . [T]he legislature is not bound, in order to support the constitutional validity of its regulation, to extend it to all cases which it might possibly reach. Dealing with practical exigencies, the legislature may be guided by experience. [Citation.] It is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest." (*Miller* v. *Wilson* (1915), 236 U.S. 373, 382-384 [35 S.Ct. 342, 59 L.Ed. 628, L.R.A. 1915F 829], affirming *In re Miller* (1912), 162 Cal. 687 [124 P. 427]; see, also, *Patsone* v. *Pennsylvania* (1914), 232 U.S. 138, 144 [34 S.Ct. 281, 58 L.Ed. 539], and cases there cited.)

■ When the classification made by the Legislature is questioned, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts is presumed, and one who assails the classification must carry the burden of showing that it is arbitrary. (*Lindsley* v. *Natu-*

*ral Carbonic Gas Co.* (1911), 220 U.S. 61, 78-79 [31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas. 1912C 160]; *Borden's Farm Prod. Co.* v. *Baldwin* (1934), 293 U.S. 194, 209-210 [55 S.Ct. 187, 79 L.Ed. 281].)

 The only facts before us are those alleged in the petition and those of which we can take judicial notice. It is alleged "that in many instances, the publishers and owners of the newspapers in which it is proposed to advertise said delinquent tax deeded properties for sale will require financing of the said contracts for advertising, that is to say, that following completion of publication under said contracts, some of these publishers will need to assign the moneys due on said contracts as collateral security or at a discount in order to realize thereon" and that the Board of Supervisors of Los Angeles County proposes to sell 90,000 parcels of real property of an assessed valuation of $30,000,000 "by advertising in local newspapers." The claims assigned to petitioner were in the sums of $53.82 and $19.98. From these allegations and other facts hereinabove related it becomes apparent that a large number of small claims arise under contracts to publish tax notices; that the practice of assigning such claims is common; and that, in the light of the legal principles above stated, the Legislature could, and should be presumed to, have found that the factual situation in the case of contracts to publish tax notices differs from the ordinary situation in the case of contracts to do other public work. The alleged fact that many publishers of tax notices operate in such manner that they commonly require financing of these small contracts suggests some support for legislative determination that there might be more likelihood of controversy between the contractors and their creditors in this field of public work than in other fields. Hence, upon all the facts alleged, it appears not unreasonable to conclude that the protection accomplished by prohibiting assignment of moneys due from the county may be peculiarly necessary in this class of contracts. (*Cf. State* v. *Kent* (1903), 98 Mo.App. 281, 288 [71 S.W. 1066, 1067], where the court upheld the validity of a municipal ordinance prohibiting assignment of claims against the city and said that among the purposes of such ordinance was "to put a stop to the notorious practice (becoming an evil in municipal employment) of selling claims at ruinous discount, and thus impairing the efficiency of the service of its employes.")

It appears, therefore, that the Legislature, in limiting its enactment to contracts for publication of documents required by the Revenue and Taxation Code, cannot be held to have arbitrarily discriminated against the publishers of such documents. We cannot say that, upon the facts alleged, there is no reasonable basis for the classification made. The more reasonable conclusion, and that which the law favors (see, e. g., *Stevenson* v. *Colgan* (1891), 91 Cal. 649, 652-653 [27 P. 1089, 25 Am.St.Rep. 230, 14 L.R.A. 459]; *Galeener* v. *Honeycutt* (1916), 173 Cal. 100, 104 [159 P. 595]; *People* v. *Western Fruit Growers* (1943), *supra*, 22 Cal.2d 494, 499), is that the Legislature has realistically and by reasonable means attempted to remedy, in the public interest, a situation which it found to be particularly prevalent or likely to become prevalent in that class of public work. ■ With this conclusion our function ends; it is not our concern whether the Legislature has adopted what we might think to be the wisest and most suitable means of accomplishing its objects. (*Otis* v. *Parker* (1903), 187 U.S. 606, 608 [23 S.Ct. 168, 47 L.Ed. 323], affirming *Parker* v. *Otis* (1900), 130 Cal. 322 [62 P. 571, 927, 92 Am.St.Rep. 56]; *Williams* v. *Mayor* (1933), 289 U.S. 36, 42 [53 S.Ct. 431, 77 L.Ed. 1015]; *City of Pasadena* v. *Charleville* (1932), *supra*, 215 Cal. 384, 400; *Metropolitan Water Dist.* v. *Whitsett* (1932), *supra*, 215 Cal. 400, 420.)

For the reasons above stated the demurrer is sustained, the petition for peremptory writ of mandate is denied, and the alternative writ discharged.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.